STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH JAMES FISCHER, DEFENDANT-APPELLANT.

Argued April 23, 1962—Decided June 29, 1962.

*Mr. Brendan T. Byrne,* Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. Peter Murray,* Assistant Prosecutor of Essex County, of counsel and on the brief).

*Mr. Martin S. Fox* argued the cause for defendant-appellant.

The opinion of the court was delivered by

HANEMAN, J.   Defendant appeals from a denial by the trial court of his post-sentence application for leave to withdraw a plea of *non vult* to a murder indictment.   *R. R.* 3:7–10(*a*).

Defendant was indicted by the Essex County Grand Jury for a self-confessed murder committed on December 26, 1953.   On February 8, 1954 Reynier J. Wortendyke, Jr., Esq. (now United States District Court Judge), and Joseph Harrison, Esq., were assigned by the court as his counsel. From the beginning defendant claims he gave counsel continuous oral and written instructions not to interpose a plea of insanity but to enter a *non vult* plea to the indictment.   After some independent investigation and conferences with defendant, counsel became convinced that there was some question of defendant's sanity.   Accordingly, due application having been made by them for the appointment of two psychiatrists, the court appointed Doctors Samuel R. Kesselman and David J. Flicker, who examined defendant.   Dr. Kesselman had had intimate and detailed contact with defendant during his prior correctional sentences, reference to which is hereafter made.   The reports of the examinations were filed by the appointed psychiatrists with defendant's counsel on April 1, 1954 and April 7, 1954 respectively.   Earlier, Dr. M. Openchowski, Essex County psychiatrist, filed with the Prosecutor of Essex County a report dated January 6, 1954 based upon an independent psychiatric examination of defendant conducted on January 4, 1954.   Counsel pursued their own investigation of the background and biography of defendant.

Dr. Flicker concluded in his report:

"Succinctly, one gets the impression that we are dealing here with a patient who had multiple psychopathic traits, that he has, in

addition, a schizophrenic form of psychosis. However, from the legal aspect, and with the concept of the McNaughten formula, he knows the nature and quality of his act, and he knows what acts are wrong. I therefore feel that despite the existence of medical insanity, the patient is competent to assist in his own defense."

Dr. Openchowski concluded in his report:

"It is my opinion that Joseph James Fischer cannot be considered actively psychotic, feebleminded or epileptic. The diagnosis remains that of a psychopathic personality with schizoid trends and aggressive episodes. He is able to distinguish between the so-called right and wrong within the legal definition of the term, is capable of consulting with his attorney in formulating his defense and give adequate account of his activities to the court and the jury. He is amenable to trial and capable of entering a plea."

Dr. Kesselman concluded in his report:

"1) This man is not mentally defective, that is, he has the native capacity to differentiate between right and wrong.

2) He is definitely psychotic, that is, mentally ill and because of his emotional disturbance and faulty judgment along with an abnormal suspiciousness he is unable to cooperate with his legal defense to the best interest for his own welfare.

3) He does not show an awareness of the seriousness of his crime.

4) This man is definitely what is classically referred to as 'a mad dog killer.' Though many would say that he would be better off dead than alive, this does not fit into our humanitarian concept.

5) The opinion of this examiner is that if this court accepts the opinion of this examiner that this man is mentally ill, Joe should be sent to the Vroom Building for the 'criminally insane' and it should be stipulated that he is never to be released from confinement."

All three reports contained some reference to defendant's insistence that he not be "bugged" (sent back to the Vroom Building).

Defendant was born in 1928. At the age of 16 he was admitted to the New Jersey State Home for Boys at Jamesburg. In 1948, after a suicide attempt, he was committed to the Essex County Overbrook Hospital at Cedar Grove. Some time after his return home in 1948 he was sentenced to an indeterminate term at Bordentown

Reformatory for having committed an atrocious assault and battery. While at Bordentown, according to the report of Dr. Kesselman,

"he competed on violent terms with another aggressive lad for the love of a passive homosexual. His threats of violence towards the passive homosexual were so persistent that it became necessary to transfer the passive homosexual to the State Hospital Vroom Building to alleviate the intensity of feeling in this triangular situation."

Subsequently, on four different occasions, Fischer himself was transferred to the Vroom Building, the maximum security unit of the State Hospital, due to periodic violent demonstrations, assaults, threats and "homicidal and paranoidal" conduct. He was sent from there to the State Prison on September 23, 1953 and released on December 14, 1953.

Upon his discharge he returned home, whereupon he immediately took to heavy and continuous drinking, quarreling and fighting with his brother. This period included a number of run-ins with the police and was climaxed by his leaving his mother's home to live with an aunt. Within two weeks he was again in confinement charged with the murder here involved. The victim was a 16-year-old stranger whom he had encountered on a bus. He and the boy got off together and walked into Belleville Park, the scene of the prior atrocious assault for which defendant was committed to Bordentown. For reasons never fully disclosed, defendant struck the boy with a rock and killed him. Within 24 hours he called the police, admitted his guilt and surrendered himself.

On April 21, 1954 defendant appeared before the trial court, retracted his plea of not guilty theretofore entered, and pleaded *non vult*. On that same day, prior to his plea, Doctors Flicker and Openchowski again examined defendant in an anteroom of the court, and were in attendance in the court room when the plea of *non vult* was proffered.

Dr. Flicker, on the following day, filed a written report of this examination, which stated:

"This patient was re-examined by me on Wednesday, April 21, 1954, immediately prior to his going into the court at which time he pleaded non vult.

Again, it is my clear impression that this man is cognizant of the proceedings. He knows exactly what is going on, knows that he intends to plead non vult, and in essence to throw himself on the mercy of the court. Further, he realizes that this is one of the means by which he might escape capital punishment. Even further than this, he recognizes that he is endeavoring to avoid being placed in a mental institution.

I believe he knows the nature of right and wrong, the nature and quality of his acts, and will be able to cooperate in the establishment of the defense."

At the time of his plea, the prosecutor propounded several questions seeking to elicit information as to whether defendant understood the nature thereof. Defendant answered these inquiries in the affirmative. On April 28, 1954 defendant appeared for sentence. Defense counsel at that time filed a written report setting forth in some detail the particulars of defendant's background and the reports of the mental examinations by the two court-appointed psychiatrists, both of which had theretofore been delivered to the judge. Counsel also orally recounted the result of their private investigations and repeated the reasons for their original recommendations for the acceptance of the plea. The trial court imposed a sentence of life imprisonment.

On March 13, 1961 defendant moved to withdraw the plea of *non vult*. New counsel was assigned. On June 3, 1961 defendant executed an affidavit in connection with his motion. The motion came on for hearing on June 9, 1961. Nowhere in the filed papers does he assert his innocence. Contrawise, he states:

"*I am now able, for the first time since the incident for which I am serving time, to fully assess my experiences during the period of the commission of the crime and my sentence.* I believe that because of my mental condition I was not able to properly follow the legal steps which were open to me. I now seek an opportunity to withdraw my plea of non vult so that I may interpose the defenses

to the charge which would have been interposed previously had I been in a position to understand the nature of my acts." (Emphasis supplied)

The motion was denied. Hence this appeal.

Defendant argues that the trial court erred in (1) denying defendant's motion for leave to withdraw the plea of *non vult* and (2) denying defendant a full hearing on his application.

## I.

An application to withdraw a previously entered plea comes within the confines of *R. R.* 3:7–10(a), which reads:

"A motion to withdraw a plea of guilty may be made only before sentence is imposed or imposition of sentence is suspended; but *to correct manifest injustice*, the court, after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea." (Emphasis supplied)

For a defendant to succeed as here, after sentence, he must make a strict showing that there was "manifest" injustice. *State v. Deutsch,* 34 *N. J.* 190, 198 (1961). "Manifest" is defined as:

"1. Evident to the senses, esp. to the sight; apparent; distinctly perceived; hence, obvious to the understanding; evident to the mind; not obscure or hidden,"

and is synonymous with

"2. Open, clear, visible, unmistakable, indubitable, indisputable, evident, self-evident."

*Webster's New International Dictionary* (2d ed. 1943).

Defendant bottoms his appeal from the refusal to grant his motion upon the assertion that on April 21, 1954 "there was grave doubt as to his mental competency and that his plea was based on an overwhelming fear of the Vroom Building," and that "he was unable to understand the

nature of his acts at the time of plea or to cooperate in his defense."

If such mental condition were found to then have existed, it could be concluded that manifest injustice would result from a denial of his present application. However, before arriving at such a conclusion, the factual complex concerning defendant's mental competence must be analyzed.

At the outset it is to be noted that defendant not only does not deny but, to the contrary, admits that he committed the homicide. Nor does he assert that he was at the time of the crime mentally incompetent within the *M'Naghten* rule. His complaint about his mental incompetence is pinpointed at a time succeeding the murder when the plea was entered. This incompetence, he claims, arose because of his fear of commitment to the Vroom Building, which was superimposed upon his "mental illness." He concludes he was thereby "not in a position to judge the real nature of what [he] was doing or to determine what course of conduct was in [his] best interests."

In effect, defendant states that he now conceives that a course of conduct other than that which he pursued was more to his personal interest—that it might have been better to stand trial rather than to have pleaded *non vult*. In the light of his admission of guilt and the failure of any of the three above-named psychiatrists to certify that at the time of the commission of the crime, his mentality was such as to warrant a defense of legal insanity, it is difficult to conceive of any defense to the indictment. Defendant's position therefore reduces itself to an argument that in retrospect he now feels that it might have been better for him to gamble his life rather than plead.

Further, it is to be noted that defendant's position that he was unable to cooperate with his counsel or understand the nature of his plea is expressly negatived by the original reports of Doctors Flicker and Openchowski. Nor does the report of Dr. Kesselman support defendant's contention. That report, when read in entirety, leads to the conclusion

that defendant understood the nature and effect of what he was doing and had done but that his judgment was such as not to qualify him to know what was "to the best interest for his own welfare." This is a far cry from saying that he did not comprehend the court proceedings or the results of his action. It merely iterates a possible error in deciding which of two courses was the better for him to pursue. Additionally, the examination of Doctors Flicker and Openchowski immediately before defendant's plea; their attendance in court during the acceptance of the plea without voicing objection and Doctor Flicker's report of that examination, leave no doubt that they were satisfied as to his comprehension and ability to cooperate with counsel. It must also be remembered that the plea was entered with consent of his counsel, two capable, outstanding and experienced members of the bar who went to great ends to satisfy themselves as to defendant's capacity, and who stated at the time defendant was sentenced:

"* * * after thoroughly assuring ourselves that our client was in a position to thoroughly understand the possibilities with which the situation was fraught and fully capable of making a decision for himself, we recommended that a proper plea be entered."

Defendant's professed fear of incarceration in the Vroom Building, superimposed upon his mental condition as described by the psychiatrists, is not persuasive of such destruction of his judgment as would confute the strong evidence pointing to the voluntary and knowing nature of his plea. We find nothing in the facts, therefore, indicative of manifest injustice.

In *State v. Wall*, 36 *N. J.* 216, 218 (1961), this court said:

"* * * The time for decision is before plea, and an accused is entitled to counsel to aid him in that decision. If an accused voluntarily and with understanding chooses not to defend, he may not seek relief from the sentence merely because he changed his mind. See *State v. Deutsch*, 34 *N. J.* 190 (1961) ; *State v. Forsythe*, 42 *N. J. Super.* 275 (*App. Div.* 1956), *certiorari* denied 352 *U. S.* 1013, 77 *S. Ct.* 586, 1 *L. Ed.* 2d 560 (1957). Nor may he ask

the court to explore the chances of a more favorable result if the indictment were tried and to find 'manifest injustice' upon an evaluation of the strength of the State's case. *Cf. State v. Magonia,* 25 *N. J.* 95 (1957)."

The record discloses not only that there is absent the critical element of manifest injustice which should have moved the trial judge to grant the post-sentence motion for leave to withdraw the plea, but also that defendant's action was voluntary and calculated and that he knew and understood what he was doing.

## II.

The full factual and legal situation was exhibited to the trial judge on the argument of defendant's motion by his moving papers and exhibits, including the stenographic record of the earlier proceedings and the reports of the psychiatrists. As a matter of law, on the full record there was an insufficient showing of any right to relief and so no right to a hearing for the taking of proofs. See *Janiec v. McCorkle,* 52 *N. J. Super.* 1, 18 (*App. Div.* 1958).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.