**William George BONIN, Petitioner–Appellant,**

v.

**Arthur CALDERON, as Warden of San Quentin State Prison; James Rowland, Director of the California Department of Corrections, Respondents–Appellees.**

Nos. 92–56299, 93–99000.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided June 28, 1995.

Emry J. Allen and Michael H. Roquemore, Deputy State Public Defenders, San Francisco, CA, for petitioner-appellant.

Esteban Hernandez, Supervising Deputy Atty. Gen., San Diego, CA, for respondents-appellees.

Before: WALLACE, Chief Judge, BRUNETTI and KOZINSKI, Circuit Judges.

WALLACE, Chief Judge:

William George Bonin, a California state prisoner awaiting execution at San Quentin State Prison, appeals from the district court's denial of his two petitions for writ of habeas corpus relief under 28 U.S.C. § 2254. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 1291, 2253. We affirm.

## I

Between 1979 and 1980, Bonin committed a string of shockingly brutal murders in Southern California. As a result of his activities, Bonin became known as the "Freeway Killer." Although the details of each murder vary and need not be repeated here, they shared a number of common features. In general, Bonin would pick up boys between the ages of 12 and 19 years. After engaging in various forms of homosexual activity with the boys, Bonin would murder them. The victims were usually killed by strangulation. The bodies of the victims exhibited signs that they had been beaten around the face and elsewhere, including the genital area. Marks were found on the wrists and ankles of the victims, indicating that they had been tied. Several of the bodies exhibited other more gruesome injuries. When Bonin was through with the boys, he would then dump their nude bodies along Southern California freeways. Bonin was eventually apprehended, and indictments were brought in both Los Angeles and Orange counties.

### A.

Bonin was charged in Los Angeles County with 14 counts of murder, as well as various related noncapital crimes, including robbery, sodomy, and mayhem. Multiple-murder special circumstances were alleged with respect to each murder count. In addition, a felony-murder-robbery special circumstance was alleged with respect to all but three of the murder counts, and a felony-murder-sodomy special circumstance was alleged with respect to one murder count. Two of the murder counts were dismissed before trial.

The evidence of guilt presented at trial was overwhelming. The prosecution demonstrated the remarkably similar features of the murders and their temporal proximity, which indicated that they had all been committed by a single perpetrator. In order to prove that Bonin was the individual that committed the crimes, the prosecution presented testimonial, physical, and scientific ev-

idence. Experts testified that the bodies of three of the victims bore triskelion-shaped fibers that matched the carpeting in Bonin's van. They also testified that the bodies of three other victims revealed the presence of hair that matched Bonin's. One victim's body also bore a seminal fluid stain that could have been made by Bonin. Moreover, Bonin's van was severely stained with human blood.

In addition to this physical and scientific evidence, the prosecution presented the testimony of two eyewitnesses plus others to whom Bonin had made certain confessions. Gregory Miley, one of Bonin's homosexual partners, testified that he had participated with Bonin in two of the murders. James Munro, another of Bonin's homosexual partners, testified that he had participated with Bonin in one of the murders, after which Bonin told him that he was the "Freeway Killer" and that he had committed about 14 similar murders. The prosecution also called David Lopez, a television reporter, who testified that Bonin confessed in an interview to killing ten of the twelve boys as well as several others. Two other acquaintances of Bonin, Scott Fraser and Ray Pendleton, testified that Bonin had admitted that he had picked up one of the victims and had killed him in the course of a homosexual encounter. Jailhouse informers testified regarding various confessions made by Bonin while he was incarcerated. Finally, other witnesses testified that after he had been arrested in 1975 for a homosexual attack, Bonin said he would never again leave witnesses to his crimes alive.

The defense attempted to persuade the jury that the prosecution had not met its burden of proof, principally by impeaching the credibility of the various witnesses.

The jury acquitted Bonin of two of the murder charges, and one sodomy and one mayhem charge, but found him guilty of each of the remaining counts. The jury also found to be true all of the special-circumstance allegations except for the felony-murder-sodomy special circumstance.

The penalty phase of the trial was then conducted. After less than one day of delib-eration, the jury returned a verdict of death for each of the 10 murder convictions.

### B.

After the Los Angeles trial was completed, Bonin was tried in Orange County, California for four murders and related noncapital crimes committed there. The prosecution's case was similar to that presented in the Los Angeles trial, and, as it did in the Los Angeles trial, the defense attacked the credibility of the various witnesses. It also attempted to undermine the credibility of the prosecution's scientific evidence by presenting the testimony of a carpet fiber expert who opined that the fiber samples were too small for accurate comparison to the carpet of the van.

Bonin was convicted of all four murder counts and of robbing each of the victims. The jury found a multiple-murder special circumstance and felony-murder-robbery special circumstance for each of the murders.

At the penalty phase of the trial, the evidence presented in aggravation and in mitigation was quite similar to that presented in the Los Angeles trial. After two days of deliberation, Bonin was sentenced to death for each of the four murders.

### C.

On automatic appeal to the California Supreme Court, the Los Angeles and Orange County convictions and death sentences were affirmed. *People v. Bonin,* 47 Cal.3d 808, 254 Cal.Rptr. 298, 765 P.2d 460 (1989) (Los Angeles); *People v. Bonin,* 46 Cal.3d 659, 250 Cal.Rptr. 687, 758 P.2d 1217 (1988) (Orange County). The United States Supreme Court denied Bonin's petitions for writ of certiorari with respect to each case, *Bonin v. California,* 494 U.S. 1039, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990) (Los Angeles case); *Bonin v. California,* 489 U.S. 1091, 109 S.Ct. 1561, 103 L.Ed.2d 864 (1989) (Orange County case), as well as a petition for rehearing in the Orange County case. *Bonin v. California,* 493 U.S. 914, 110 S.Ct. 272, 107 L.Ed.2d 222 (1989).

Bonin filed a state habeas corpus petition challenging his Los Angeles convictions and death sentences, as well as three separate

state habeas corpus petitions challenging the Orange County convictions and death sentences. All of Bonin's state habeas corpus petitions were denied by the California Supreme Court.

Bonin filed two habeas corpus petitions under 28 U.S.C. § 2254, one challenging his Los Angeles convictions and death sentences, and another challenging his Orange County convictions and death sentences. The petitions were assigned to the same district judge. The district court conducted three days of evidentiary hearings concerning issues raised by the petitions, and read the entire record of each case, including over 15,000 pages of trial transcripts. In separate published opinions, the district court denied both of Bonin's petitions. *Bonin v. Vasquez*, 807 F.Supp. 589 (C.D.Cal.1992) (Los Angeles); *Bonin v. Vasquez*, 794 F.Supp. 957 (C.D.Cal.1992) (Orange County).

In a published order, *Bonin v. Vasquez*, 999 F.2d 425 (9th Cir.1993), we denied the motion of Bonin's appointed counsel, the California State Public Defender, to withdraw as attorney of record. We rejected the contention that the defender's own ineffectiveness in its previous handling of the petitions constitute grounds for relief and therefore create a conflict of interest mandating the appointment of new counsel. *See id.*

### D.

■ In this consolidated appeal, we review the district court's denial of both of Bonin's habeas corpus petitions. Bonin has raised a battery of issues, some alleging violations of his federal constitutional rights at the trials themselves and others alleging errors by the district court in denying the petitions. Bonin makes the following primary arguments:

1. He was denied effective assistance of counsel at both trials because his trial attorney suffered from a conflict of interest;

2. He was denied effective assistance of counsel because his trial attorney failed to investigate adequately and present mitigating evidence at the penalty phases of both trials;

3. He was denied his Fifth, Eighth, and Fourteenth Amendment rights when the prosecution introduced evidence of the Orange County murders at the penalty phase of the Los Angeles trial;

4. He was denied a fair trial because of the Orange County trial court's denial of his motion for change of venue;

5. He was deprived of due process and effective assistance of counsel as a result of the trial court's refusal to allow his second attorney to argue at the penalty phase of the Orange County trial;

6. He was deprived of due process because the Los Angeles trial court refused to suppress the testimony of Munro and Miley;

7. He was deprived of due process in both trials as a result of prosecutorial misconduct;

8. The district court erred by dismissing Bonin's proposed amendments to his habeas corpus petitions; and

9. The penalty juries in both trials were biased in favor of the death penalty due to instructional errors.

In examining these claims, we review de novo the denial of Bonin's petitions for writ of habeas corpus. *Adams v. Peterson*, 968 F.2d 835, 843 (9th Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993). However, findings of fact made by the district court relevant to the denial of his habeas corpus petitions are reviewed for clear error. *Thomas v. Brewer*, 923 F.2d 1361, 1364 (9th Cir.1991) (*Thomas*). We may affirm on any ground supported by the record, even if it differs from the rationale of the district court. *United States v. Washington*, 969 F.2d 752, 755 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993).

■ To obtain habeas corpus relief, Bonin must demonstrate that his conviction or punishment violates the federal Constitution, a federal statute, or a treaty. 28 U.S.C. § 2241(c)(3); *Rose v. Hodges*, 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975). Because of the limited scope of habeas corpus review, trial errors do not warrant relief unless the errors "had substantial and injurious effect or influence in determining the jury's verdict" such that they deprived Bonin

of a fair trial in violation of his right to due process. *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (*Brecht*) quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946) (*Kotteakos*). Errors which do not meet this test are deemed harmless. In the exceedingly rare case in which a court finds itself utterly unable to determine whether the error was harmless, but is rather in "grave doubt" about whether the error had substantial and injurious effect on the jury's verdict, the court should not treat the error as harmless. *O'Neal v. McAninch*, —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995). This assumption applies, however, only in the remarkably unusual circumstance where "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

## II

Bonin argues that he was denied the effective assistance of counsel at both of his trials because his trial attorney, William Charvet, had a conflict of interest. Bonin asserts that he and Charvet had entered into a literary rights agreement before Charvet became his trial attorney, and that the existence of the literary rights agreement gave Charvet an incentive, subsequent to his retention, to maximize publicity about the case rather than to represent Bonin effectively. Bonin also alleges that Charvet agreed to represent him in the Los Angeles trial in return for an additional ten percent of the literary rights proceeds, and argues that a conflict of interest existed because Charvet had to pay for investigative costs out of his own pocket. Bonin further asserts that Charvet refused to call a potential witness, Dr. Lunde, at the penalty phase of the Orange County trial, because he feared Dr. Lunde would reveal the literary rights agreement. Bonin maintains that he was never warned of the dangers inherent in Charvet's representation of both his literary interests and his trial defense.

The State paints a different picture. It argues that Bonin and Charvet engaged only in tentative discussions regarding a book transaction that led merely to a letter of intent executed between the parties. The State also insists that Charvet warned Bonin and his family of the potential implications of Charvet's representation of Bonin in both capacities. The State maintains that these discussions had ceased and that any arrangement had been terminated before Charvet began representing Bonin in the Los Angeles trial, and that Bonin signed a release of the letter of intent after Charvet assumed the role of trial counsel. The State further asserts that Charvet warned Bonin that it would not be a good idea to pursue a book deal while the criminal proceedings were pending.

Bonin was originally represented by Earl Hanson, an appointed public defender. While Hanson was preparing for the Los Angeles trial, Bonin contacted Charvet for assistance in having his life story published. Bonin, Charvet, and a writer, Mary Neiswender, reached a tentative understanding concerning the division of the proceeds. As indicated earlier, the State argues that these discussions eventually led to the drafting of an unsigned letter of intent but nothing more. Bonin argues, however, that the parties reached a firm agreement.

At some point, Bonin asked Charvet to take over his defense and Charvet moved to be substituted as trial counsel. Bonin was present in the courtroom throughout the substitution proceedings. Hanson did not oppose the motion and repeatedly emphasized to the court that he had never been Bonin's attorney of choice, that Bonin had in fact requested the appointment of a different attorney immediately after he met Hanson, and that Bonin did not feel that he could talk to Hanson. When asked by the trial court whom he would rather have as his attorney, Bonin said that he wanted to be represented by Charvet, and explained that he did not feel that he could discuss certain subjects with Hanson.

The prosecution objected to the substitution on several grounds, including that Charvet was being compensated, at least in part, with book rights. When the trial court inquired into Charvet's fee arrangement, Char-

vet declined to divulge his arrangement with Bonin, insisting that if Bonin's only asset was a book right, he could use that asset to secure counsel of his choice. Although the trial court originally suggested that it would deny the motion to substitute so as to avoid further delay, Bonin later made it clear by moving to proceed pro per that he would rather represent himself than continue to be represented by Hanson. Given the hard choice of allowing Bonin to proceed pro per or allowing Charvet to be substituted as trial counsel, the trial court eventually allowed the substitution.

"In a federal habeas action, a claim of ineffective assistance of counsel, and/or of conflict of interest on the part of counsel, presents 'mixed question[s] of fact and law' and receives de novo review." *Sanders v. Ratelle*, 21 F.3d 1446, 1451 (9th Cir.1994) (*Sanders*), *quoting Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (*Strickland*). However, " 'state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of [28 U.S.C.] § 2254(d)'.... Likewise, a federal district court's findings ... are reviewed under the clearly erroneous standard prescribed by Fed.R.Civ.P. 52(a)." *Id.* at 1451–52, *quoting Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, and *citing Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir.1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987).

■ The Sixth Amendment right to counsel includes the right to counsel of undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981). The test for determining whether an alleged conflict of interest has deprived Bonin of his right to counsel in violation of the Sixth Amendment was established by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (*Cuyler*). The Court explained that "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350, 100 S.Ct. at 1719. Although a defendant "need not demonstrate prejudice," he must prove that "counsel actively represented conflicting interests." *Id.* at 349–50, 100 S.Ct. at 1719.

While *Cuyler* addressed a conflict of interest generated by multiple representation, we have specifically held that *Cuyler* applies to conflicts of interest generated by an attorney's acquisition of publication rights relating to his client's trial. *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.1980) (*Hearst*), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). We have also applied the *Cuyler* test to conflicts resulting from counsel's desire to keep information about himself from the court. *United States v. Hoffman*, 733 F.2d 596, 601–02 (9th Cir.) (*Hoffman*), *cert. denied*, 469 U.S. 1039, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984).

■ Therefore, to obtain habeas corpus relief on the basis of the alleged conflict, Bonin must show: (1) that counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected his lawyer's performance. *Mannhalt v. Reed*, 847 F.2d 576, 579 (9th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988).

In considering Bonin's Orange County petition, the district court held an evidentiary hearing on the conflict issue. *Bonin v. Vasquez*, 794 F.Supp. at 963. "After listening to the testimony, observing the witnesses, examining the exhibits, and considering the briefs submitted," the district court found that "Bonin and Charvet never had a literary rights agreement." *Id.* "Instead, the evidence repeatedly demonstrated that the relevant parties—Bonin, Charvet, and Neiswender—expressed interest in such an arrangement, but the expressions of interest never came to fruition." *Id.* The district court further concluded that in the absence of such an agreement, no actual conflict of interest could have existed. *Id.* at 964. The district court took judicial notice of this finding in its opinion concerning the Los Angeles case. *Bonin v. Vasquez*, 807 F.Supp. at 602.

■ The district court's determination that no literary rights agreement ever came into existence is a finding of fact. We may therefore reject it only if it is clearly erroneous. *Sanders*, 21 F.3d at 1451; *Thomas*, 923

F.2d at 1364. There is a substantial amount of evidence supporting each side of this factual dispute, and the evidence does show that Charvet at least pretended to have a literary rights agreement with Bonin for the purpose of obtaining money from his fiancee, Rhodora Hood. However, the district court's finding that no literary rights agreement ever existed is not clearly erroneous. Therefore, Bonin has failed to prove that the alleged agreement created a conflict of interest.

Bonin also has an alternative argument. He contends that even if there was no literary rights agreement, a conflict was created nonetheless by Charvet's "ongoing financial motive" to profit from a *prospective* literary rights agreement. Bonin points to a number of reasons why Charvet's alleged desire to profit from a possible future literary rights agreement may have come into conflict with Bonin's interests. He asserts that Charvet substituted as retained counsel in the Los Angeles case for fear of losing the alleged prospective literary rights agreement and that by doing so, Charvet deprived him of properly prepared counsel. He also argues that Charvet failed to call Dr. Lunde, a psychiatrist who had evaluated Bonin at Charvet's request, to testify at the Orange County trial because Dr. Lunde had learned about Charvet's dealings with Bonin concerning the alleged literary rights agreement and might disclose them to the court, resulting in the loss of Charvet's appointment or at least "an investigation of Charvet's true motives."

■ *Cuyler* not only provides the appropriate standard for analyzing claims of conflict generated by literary rights agreements, *Hearst,* 638 F.2d at 1193–94, it is also our guide in assessing an argument that an attorney created a conflict by his desire to keep information about himself from the court. *Hoffman,* 733 F.2d at 601–02. The Court explained in *Cuyler* that when a defendant's attorney labors under an actual conflict of interest, for example by actively representing codefendants with inconsistent defenses, we are not to "indulge in nice calculations as to the amount of prejudice," but instead we require the defendant to show only that counsel's performance was adversely affected. *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1718, *quoting Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467–68, 86 L.Ed. 680 (1942). However, in order to show the existence of an actual conflict, Bonin cannot simply show that the interests of the attorney and client might possibly have come into conflict, as "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." *Id.* at 348, 100 S.Ct. at 1718. Rather, Bonin must show that his interests actually came into direct conflict with those of Charvet. *Id.*

■ Bonin's contention that Charvet substituted as retained counsel in Los Angeles because of his desire to obtain a prospective literary rights agreement fails to allege the type of actual conflict required by *Cuyler.* Lawyers almost always undertake representation of clients because of their desire to profit from the representation. The fact that Charvet may have intended to profit not through the typical manner of hourly billing but by gaining publicity by handling a high profile case and by perhaps being included in any literary rights agreement that might be formed in the future does not change the analysis. The fact that an attorney undertakes the representation of a client because of a desire to profit does not by itself create the type of direct "actual" conflict of interest required by *Cuyler.*

■ Bonin's argument that Charvet refused to call Dr. Lunde to testify at the Orange County trial to avoid the disclosure of Charvet's dealings with Bonin concerning the prospective literary rights agreement also fails to allege the type of actual conflict required by *Cuyler.* In *Hoffman,* we held that an attorney's failure to disclose to the United States District Court for the District of Arizona, before which he was representing a client, his suspension from practice in the State of Florida, which would not necessarily have resulted in his automatic suspension in the District of Arizona, did not create an actual conflict of interest under *Cuyler.* *Hoffman,* 733 F.2d at 602. Thus, an attorney's desire to keep personal information from the court does not invariably create actual conflict of interest. In this case, Dr. Lunde might not have disclosed any information harmful to or embarrassing to Charvet

even if he had been called to testify. Moreover, Charvet would not necessarily have lost his appointment even if Dr. Lunde had disclosed whatever information Bonin told him about the "book deal." Because Charvet was not necessarily placed in an adversarial position relative to Bonin, he has only succeeded in showing a remote possibility of a conflict and not an actual conflict. *See id.*

■■■■ If the types of conflicts alleged by Bonin were to be cognizable under *Cuyler,* the rule would become hopelessly unworkable. As human beings, attorneys always have interests of their own independent of those of their clients. Where a direct and significant conflict of interest exists between a defendant and his client, it is reasonable to presume that the defendant has been prejudiced as a result. However, minor or potential conflicts of interest often exist which might theoretically or conceivably affect an attorney's representation, but are not likely to do so. Such "potential" conflicts are insufficient under *Cuyler.* In the absence of an "actual" conflict which squarely places the interests of the client in opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty, the *Cuyler* standard cannot be met. If a mere "potential" or "theoretical" conflict does affect an attorney's representation in a particular case, the defendant is not without recourse. However, he cannot rely on *Cuyler* and obtain relief merely upon a showing of "adverse effect," but must instead make the showing required by *Strickland* that counsel's performance was objectively unreasonable and that he suffered prejudice as a result. *See Strickland,* 466 U.S. at 692–94, 104 S.Ct. at 2067–68. Because Charvet's alleged desire to profit from a prospective literary rights agreement created only a "potential" conflict of interest, Bonin has failed to make the required showing under *Cuyler.*

■■■■ Bonin also argues that Charvet had a conflict of interest in the Los Angeles trial because his substitution as retained counsel deprived Bonin of state-funded investigators and expert witnesses, thereby requiring Charvet to pay for any investigators or experts out of his own pocket. This allegation of conflict is also inadequate under *Cuyler.* As we recently held in *Williams v. Calderon,* 52 F.3d 1465 (9th Cir.1995) (*Williams* ), an assertion of conflict based on the fact that "payment for any investigation or psychiatric services could have come from counsel's pocket forc[ing] counsel to choose between [the client's] interests and his own . . . is the same theoretical conflict that exists . . . in any pro bono or underfunded appointment case." *Id.* at 1473. While such arrangements create a theoretical conflict of interest, they do not typically create actual conflicts under *Cuyler.* Nor was an actual conflict created by Charvet's representation of Bonin as retained counsel.

■■■■ Bonin also raises two related issues concerning the alleged conflict of interest. First, the district court did not hold an evidentiary hearing on the conflict of interest issue in reviewing the Los Angeles petition. Instead, it took judicial notice of its own findings with regard to the Orange County case. *Bonin v. Vasquez,* 807 F.Supp. at 602. Bonin argues that the district court erred in failing to hold an evidentiary hearing on this issue in his Los Angeles case, and that taking judicial notice of its findings in the Orange County case failed to cure this defect.

The Supreme Court has held that "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). However, there is no sound reason why the petitioner should be entitled to two evidentiary hearings on the same issue. There is no indication that two evidentiary hearings conducted by the same federal judge on the same issue are necessary to protect a habeas corpus petitioner's interests. Moreover, any advantage gained by the habeas corpus petitioner certainly would not outweigh the obvious waste of judicial resources this would entail.

We hold that the district court was not required to conduct two separate hearings.

In *Farrow v. United States,* 580 F.2d 1339 (1978), we explained that "as the new Rules Governing Habeas Corpus Cases now make express, it is consistent with the habeas corpus procedure under § 2254 that 'the district judge ... employ a variety of measures in an effort to avoid the need for an evidentiary hearing.' ... Where the judge's own recollection enables him to answer in the negative the 'real question' ... an evidentiary hearing is unnecessary." *Id.* at 1352–53, *quoting Blackledge ϑ. Allison,* 431 U.S. 63, 81, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977).

 Second, Bonin argues that he was denied a full and fair hearing on the conflict of interest issue because the district court refused to allow Dr. Lunde to testify on that issue and refused to allow Bonin to admit State Bar records indicating that Charvet had defrauded clients. A "district court's evidentiary rulings are reviewed for an abuse of discretion and will not be reversed unless the party has been prejudiced." *Price v. Seydel,* 961 F.2d 1470, 1474 (9th Cir.1992) (*Price*). Moreover, a "court may exclude testimony from witnesses not listed in the pretrial witness list." *Id.* However, in determining whether to admit the testimony of unlisted witnesses, the district court should consider: (1) the possibility of prejudice or surprise to the other party, (2) the ability of the other party to cure the prejudice, (3) the extent to which waiver of the rule against calling unnamed witnesses would disrupt the orderly and efficient trial of the case, and (4) bad faith or willfulness in failing to comply with the court's order. *Id.*

The district court did not abuse its discretion. The district court refused to allow Dr. Lunde to be called because he was never placed on Bonin's witness list as required by a prior court order. Bonin did not depose Dr. Lunde, did not place him under subpoena, and did not put him on his witness list. This is the type of lack of notice that prejudices the opposing party's ability to respond to testimony or to cross-examine effectively. More importantly, Bonin had already been allowed to call a witness who was not on his witness list and had been warned that he would not be allowed to do so again. Thus, the district court's actions were justified by

the need to prevent further disruption of the proceedings and as a sanction for the willful violation of the court's order.

The district court's decision not to admit records of complaints lodged with the State Bar was also not an abuse of discretion. Admittedly, we held in *Sanders* that an attorney's subsequent disbarment for a course of conduct with other clients in which he exhibited "general incompetence and indifference to the interests of his clients," was probative of whether his failure to investigate the case stemmed from a strategic decision or mere incompetence and indifference. *See Sanders,* 21 F.3d at 1460. However, *Sanders* involved the "rare case" in which counsel's objective incompetence was so severe that the petitioner might have been convicted of murder despite his actual innocence, *id.* at 1455, and in which the attorney only briefly explained his actions to one other person, *id.* at 1452, and could not be located to testify at the evidentiary hearing conducted by the district court. *Id.* at 1451.

In any case, *Sanders* does not hold that prior instances of misconduct or unrelated complaints to state bar associations should ordinarily be admitted as evidence that an attorney acted incompetently or that otherwise presumptively reasonable decisions were actually made due to general disinterest or other impermissible reasons. Indeed, *Sanders* did not concern the admissibility of such evidence at all. Although we held such evidence relevant in *Sanders,* we did not address the standards to be employed by the district court in deciding whether to admit such evidence and the state apparently offered no objection to its admission or use.

Notwithstanding our use of such evidence in the extraordinary situation presented in *Sanders,* it is clear that a habeas petitioner should not be allowed to transform what should be an inquiry into the reasonableness of counsel's performance at his trial into an general inquisition of defense counsel's record and reputation. Because the essential inquiry is whether the petitioner received objectively reasonable and conflict-free representation, evidence that the attorney may have erred or acted inappropriately in unrelated cases will normally have little, if any,

probative value, and may therefore be properly excluded by the district court pursuant to Federal Rule of Evidence 403. Moreover, because Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," prior acts of misconduct on the part of defense counsel are inadmissible to support a claim that counsel must have acted similarly in a particular case.

█ Prior acts of dishonesty may have been useful to Bonin as a means of attacking the credibility of Charvet's testimony (taken by means of deposition) concerning his reasons for conducting the trials as he did, and the district court properly authorized Bonin to question Charvet concerning these acts at the evidentiary hearing. However, to the extent Bonin sought admission of the State Bar records themselves to impeach the credibility of Charvet's testimony, the admission of such evidence was prevented by Federal Rule of Evidence 608(b), which prohibits the use of extrinsic evidence to prove specific instances of misconduct for the purpose of attacking a witness's credibility. However Bonin intended to the use the State Bar records, it is clear that the district court did not abuse its discretion by refusing to admit them.

## III

Bonin contends that he was deprived of his Sixth Amendment right to effective assistance of counsel because Charvet failed to investigate and present substantial mitigating evidence at the penalty phases of both of his trials. He contends that Charvet should have investigated, found and presented evidence: (1) that Bonin was abandoned and abused as a child, and (2) that Bonin suffered from brain damage. He contends that had the juries been presented with both the childhood mitigation evidence and the evidence of brain damage, they would have sentenced Bonin to life imprisonment rather than death. He also argues that Charvet committed an additional prejudicial error in the Orange County trial by calling Virginia Padgett as a witness.

### A.

At the penalty phase of the Los Angeles trial, the prosecution assembled a formidable case on aggravation. It presented Bonin's record of prior adjudicated homosexual offenses: as a result of several homosexual attacks Bonin committed in late 1968 and early 1969, Bonin had pleaded guilty to molestation and forced oral copulation involving 12–year–old Lawrence B., kidnapping and sodomizing 14–year–old William J. and 17–year–old John T., and of forced oral copulation involving 18–year–old Jesus M. These victims testified in detail about the manner in which they were abducted and sexually abused by Bonin. While each of their experiences was unique, their testimony made it clear that Bonin's actions were cruel and outrageous. They were abducted and handcuffed, forced to orally copulate Bonin and forced to be sodomized by him, and were threatened with death if they told anyone. One victim told of being gagged with his underwear, another was choked to the verge of unconsciousness, and two victims related that Bonin hurt them by applying pressure to their testicles. When Bonin was finally apprehended in 1969, he was driving with a 16–year–old male passenger, and he told police officers that they were lucky that they had caught him because he felt that he might have killed the boy.

After Bonin pleaded guilty to the offenses, he was committed to Atascadero State Hospital as a mentally disordered sex offender amenable to treatment. In 1971, he was declared unamenable to treatment and was sent to prison.

Upon his release from prison in 1974, Bonin resumed his pattern of sexual predation. David M. testified that in 1975, when he was 14 years old, he was abducted, forced to orally copulate and allow himself to be sodomized by Bonin while Bonin held a gun to his neck. Gary E. also testified that Bonin unsuccessfully attempted to abduct him in 1975. After Bonin was arrested for his attack on David M., he told police officers that he would never leave witnesses to his crimes alive again. Bonin was convicted of forcible

oral copulation and was again sent to prison, only to be paroled in 1978 and to resume his pattern of homosexual predation with newfound vigor.

The prosecution attempted to prove beyond a reasonable doubt that Bonin was responsible not only for the ten Los Angeles murders and related crimes for which he had already been found guilty, but also for the four Orange County murders and related crimes for which he had not yet been tried.

Police officers, coroners, and other witnesses, with the assistance of vivid photographs, explained the gruesome details of Bonin's carnage. The bodies of the victims all exhibited marks on the wrists and ankles, indicating that they had been tied with rope or wire. Almost all of the victims were killed by strangulation, accomplished by twisting a rope or wire that had been wrapped around their necks. The nude bodies of the victims were then dumped along Southern California freeways.

The prosecution presented the jury with many of the shockingly brutal details of the murders. The jury learned that Bonin forced Darin Kendrick to drink acid and that Bonin stabbed an ice pick three and one-half inches into his ear. They learned that Bonin bragged to a cellmate that he enjoyed sodomizing his victims without lubrication so that their rectums would tear and bleed, and that he would ram a foot and half long object into them. Several of the victims' rectums exhibited signs of injury. Donald Hyden's anus was not only visibly bruised and bleeding, but so stretched that the coroner opined that a very large object had been thrust into it. Markus Grabs had been stabbed approximately 70 times. James Macabe's skull had been crushed. Miley testified that he and Bonin killed Macabe by laying a tire iron across the boy's neck and pushing down on it until they could hear his neck bones cracking.

The prosecution's aggravation evidence also included that Bonin had no remorse for his actions, but rather took a sick pleasure in them. Munro testified that while they were on their way to dispose of Steven Wells's body, which was beginning to smell bad, he and Bonin stopped to get take-out food.

While they ate the food they had purchased with money stolen from Wells, Bonin asked Munro if he wanted to "do another one." Munro also testified that while Bonin was eating, he looked up and laughed: "Thanks Steve, wherever you are." Miley testified that immediately after he and Bonin had disposed of Charles Miranda's body, Bonin said: "I'm horny. Let's go get another one." The prosecution emphasized that Bonin was quite intelligent, with a tested IQ of 120 and had been categorized by the Department of Corrections as being of "superior intelligence."

Reporter David Lopez added another dimension. He testified that Larry Sharp, one of the Orange County victims, was actually a close friend of Bonin. Bonin had taken him to Knott's Berry Farm and once said they were "lovers." Yet when asked why he killed Sharp, Bonin explained: "I just got up one morning and decided I was tired of him. I just got tired of having him around and so I decided that I should kill him." When Lopez asked Bonin what he would be doing if he were still on the street, Bonin remarked: "I'd still be killing. I couldn't stop killing. It got easier with each victim I did."

Charvet vigorously cross-examined the prosecution's witnesses and attempted to impeach their credibility, both in order to discredit some of the most damaging aggravation testimony and to create doubt as to whether Bonin actually was guilty of the yet untried Orange County murders. Charvet effectively attempted to discredit the testimony of David Lopez, who Charvet pointed out took almost no notes during his interviews yet had an uncanny ability to recite with particularity what Bonin supposedly told him. Charvet also used the testimony of Munro and Miley to suggest that they themselves were the culpable individuals, but were testifying against Bonin only in exchange for lenient plea agreements.

Bonin's mother testified that Bonin's father drank excessively and gambled away the family home. She reported that Bonin's father beat her in front of the children, and that the children were also beaten when she was away. Importantly, she testified that

Bonin was molested as a child while staying at a detention home. Bonin's mother stated that she and Bonin had a long-standing conflict over Bonin's homosexuality. She observed that Bonin was different when he returned from Vietnam. She further testified that although Bonin got into trouble when at home, he always functioned well in structured environments such as the detention home and a convent in which he lived for three years. She testified that he did "very well" in the convent and that she received "good reports" while he was there.

Charvet called Bonin's older brother Robert whose testimony mirrored that of Bonin's mother: their father drank and gambled excessively, he beat them and their mother, and Bonin's attitude was different when he returned from Vietnam. He repeatedly acknowledged that Bonin always functioned well in controlled environments such as the convent and the detention home. Robert also contradicted some of Munro's testimony. Bonin's younger brother Paul added that he and Bonin frequently picked up hitchhikers and that Bonin never harmed any of them.

Charvet also called Everett Fraser who testified that he was Bonin's friend from 1978 until the time Bonin was arrested. He stated that Bonin had come over to his home about 50 times during this period, that he had brought young men on 12 to 15 of these occasions, and that Fraser had introduced young men to Bonin. He stated that Bonin was never violent in any way. Fraser explained that based on his knowledge of Bonin as a "respectful" person, he was shocked to be advised of the murders.

Charvet also called Kathleen Shuttleworth, a psychologist and Bonin's former preparole counselor. She testified that Bonin seemed to be "very interested in helping people." She described his participation in helping the family of a prisoner in New England. He raised money for their necessities, wrote to state welfare agencies on their behalf, started a fund to buy them a home, and even offered to make the payments himself if necessary. She stated that Bonin should not be sentenced to death because he could help other inmates and would be a useful member of prison society.

Shuttleworth corroborated Bonin's being molested as a young child, and that Bonin was honorably discharged from the Army after Vietnam where he was awarded several medals. Finally, she testified that Bonin sincerely and continuously cried out for help while in prison, at one point even applying for a six-month treatment program conducted by the Veterans Administration.

In his closing argument, Charvet pressed his principal mitigation theory, arguing that although Bonin was dangerous outside of prison and other structured settings, he was capable of functioning very well in a controlled environment such as prison and was actually of benefit to society when incarcerated. He emphasized that Bonin helped others while in prison, and that he was willing to assist or participate in any programs to help find out what caused him and others to commit such crimes. Viewed in this light, Charvet pointed out that nothing would be served by Bonin's death except retribution.

Charvet also attempted to humanize Bonin in the eyes of the jury, by emphasizing that Bonin cried out for help while in prison in the seventies, and argued that Bonin's violent experience in Vietnam was responsible for his subsequent behavior.

### B.

The evidence of aggravation at the Orange County trial included every detail presented in the Los Angeles trial plus the fact that Marcus Grabs not only had been stabbed about 70 times all over his body, but his anus was so largely dilated that an item the size of a fist must have been thrust into it. In addition, the jury learned of similar injuries to the anus of Donald Hyden, and were advised that Hyden's body exhibited a puncture wound below the ear, another puncture wound in the scrotum, a burn mark just above the groin, and that his lips and face were bruised. They also learned that Harry Turner had been bitten on the penis and shoulder. In short, with even greater force than in the Los Angeles trial, the prosecution presented what appeared to be an endless list of atrocities committed by Bonin.

The defense's case in mitigation was also similar to that presented in Los Angeles, except that instead of Kathleen Shuttleworth, Charvet called Virginia Padgett, the custodian of records at Atascadero. She proved to be a less favorable witness for Bonin. When asked whether there was any reason other than his homosexuality for his being declared unamenable to treatment at Atascadero, she retorted: "We're not talking about preying upon the mentally retarded or the mentally ill. When you include your sexuality—Homosexuality?" Although Padgett conceded that there was no evidence that Bonin ever forcibly sodomized or forcibly committed a homosexual act on an inmate in Atascadero, the jury learned that Bonin had engaged in homosexual acts with two retarded patients. The use of Padgett as a defense witness also backfired during her cross-examination when she agreed with the prosecution's statement that "the closest the defendant got to combat in Viet Nam [sic] was when he held a gun to two soldiers' head [sic] and sodomized them?"

Padgett's testimony did establish the mitigating circumstances that had previously been established in the Los Angeles case: that Bonin was decorated in Vietnam, that he was abused as a child, that he had volunteered for experimental treatment programs while at Atascadero, that he was neat, clean, nonviolent, attended therapy groups regularly, and that he did his work willingly in prison. In addition, she explained that Bonin was going to marry a young woman before he went to Vietnam but he returned to discover that she had already married someone else.

### C.

The district court held evidentiary hearings concerning Bonin's ineffective assistance of counsel claims. Bonin presented the evidence that he asserts should have been discovered and presented in mitigation at the penalty phases of his trials: (1) "evidence of repeated abandonment during childhood"; (2) "evidence of pervasive physical, sexual and emotional abuse during childhood"; and (3) "evidence of organic brain damage."

The evidence of repeated abandonment during childhood consisted primarily of testimony by Dr. David Foster, an expert on the developmental effects of violence and abuse on children. Dr. Foster opined that Bonin had, as a result of repeated abandonment, not received the nurturing, protection, and behavioral feedback as a child necessary for proper psychological development. The evidence of pervasive physical, sexual and emotional abuse during childhood also came largely from Dr. Foster, who opined that Bonin had suffered such abuse and that it had led "to confusion about the differences between violence and love" as well as "detachment and the use of fantasy and denial and more primitive defenses to protect himself." The evidence of organic brain damage was primarily the testimony of Dr. Pincus, who testified that Bonin exhibited a "snout reflex" and a "right Babinski reflex" which are indicative of frontal lobe damage. Dr. Pincus also testified that although the psychological manifestations of frontal lobe damage vary, persons with frontal lobe damage are usually impulse driven. Dr. Pincus speculated that it was also possible that Bonin suffered from "organic personality disturbance," which involves behavioral abnormalities caused by brain damage. Dr. Foster opined that some of Bonin's symptoms are consistent with frontal lobe damage, but also suggested that Bonin may suffer from other minor disorders, particularly attention deficit disorder.

Expert witnesses for the State came to opposite conclusions. Dr. Park Elliott Dietz, an expert in forensic psychiatry with expertise in impulse disorders and sexual sadism, testified that Bonin's behavior was not consistent with an inability to control impulses. In addition to pointing out that Bonin has never engaged in impulsive behavior in prison, he explained that the manner in which Bonin committed his crimes, particularly the way in which he lured his victims into his van and disposed of the bodies in remote locations, are "reflective of planning and deliberate actions rather than impulsive behavior."

Dr. Dietz also disagreed with Dr. Pincus's opinion that Bonin suffered from frontal lobe damage. He testified that there was no evi-

dence that Bonin suffered from seizures. Dr. Dietz stated that Bonin's medical records showed that he exhibited no Babinski reflex when examined in 1969 after he had already been incarcerated for kidnapping and forced oral copulation. Dr. Dietz concluded that Bonin's present Babinski reflex and its source could not be the source of his desire to sexually assault young men.

Dr. Dietz also testified that there was a great deal of evidence indicating that Bonin does not presently suffer from frontal lobe damage. Dr. Dietz observed that a Babinski reflex does not necessarily indicate frontal lobe damage. He also explained that other than a snout reflex and Babinski reflex, Bonin did not exhibit other reflexes and behaviors typically associated with frontal lobe damage.

Additionally, Dr. Dietz stated that Dr. Foster's report had repeatedly mischaracterized and exaggerated the evidence he relied on in forming his conclusion that Bonin had been subjected to physical, emotional, and sexual abuse. He concluded that Bonin was a sexual sadist, and that Bonin may also suffer from antisocial personality disorder, but that neither of these conditions impair an individual's free will or ability to control his actions.

A neurologist, Dr. Mark Nuwer, also testified on behalf of the state to refute Bonin's assertion that he suffered from frontal lobe damage. Dr. Nuwer stated that Bonin's magnetic resonance imaging and electroencephalogram tests were normal, and that in the absence of some corroboration through these tests, he would consider a snout reflex a "red herring." He testified that without some other corroboration, a snout reflex in combination with a Babinski reflex "doesn't tell you anything about a diagnoses."

### D.

In assessing Bonin's claim that Charvet's failure to present mitigating evidence at the penalty phase of his trials constitutes ineffective assistance of counsel under the Sixth Amendment, we apply *Strickland; Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986) (*Darden*); and *Wade v. Calderon,* 29 F.3d 1312, 1323

(9th Cir.1994) (*Wade*) cert. denied, —— U.S. ——, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995), and require Bonin to demonstrate: (1) "that counsel 'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" and (2) "that 'the deficient performance prejudiced the defense.'" *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.1994) (en banc) (*Campbell*), quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

In reviewing Charvet's performance, the ultimate question is whether "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. In making this determination, however, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. In doing so, we "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell,* 18 F.3d at 673. Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id., quoting Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

Bonin is deemed to have suffered "prejudice" as the result of Charvet's performance if he succeeds in demonstrating that "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Wade,* 29 F.3d at 1323, *citing Strickland,* 466 U.S.

at 687, 104 S.Ct. at 2064. Thus, in order to determine whether Charvet's failure to present certain evidence in mitigation might have affected the jury's decision, it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently.

### E.

 Almost all of the childhood mitigation evidence offered by Bonin at the evidentiary hearing was utilized by Charvet during both of the trials. The evidence that was not presented by Charvet would have been of little value. That life at the convent was not pleasant, or that Bonin was often dirty and hungry as a child would have added little to the Bonin's case and might actually have distracted the jury from the more potent mitigation evidence. The only significant evidence presented by Bonin at the evidentiary hearing that Charvet failed to employ was the testimony of experts on the developmental effects of child abuse and neglect. However, while the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense. Given that such expert testimony would have been of value only to the extent that Bonin could actually show that he had been subject to neglect and abuse, it would have been of slight value at best. Moreover, it would have opened the door to precisely the type of cross-examination that Charvet sought to avoid by refusing to call psychiatric experts—another recitation of all of Bonin's atrocities for the purpose of determining whether, in the expert's opinion, such behavior is the likely product of such abuse. Charvet's presentation of childhood mitigation evidence was clearly reasonable.

 We also conclude that it was reasonable for Charvet not to investigate further and present evidence of brain damage or other psychiatric disorder. Charvet made a tactical decision to rely principally on an "institutional adjustment" mitigation theory. This decision did not foreclose the use of other mitigation evidence. Indeed, Charvet used other mitigation evidence, including Bonin's childhood history and Vietnam experience. When asked why he decided not to present expert psychiatric testimony at either trial, Charvet responded that he feared that the presentation of psychiatric testimony would "open the door" to allow the prosecution to parade the horrible details of each of the murders before the jury under the guise of asking the psychiatrist or other expert whether Bonin's acts conform to the asserted diagnosis. Charvet explained that although he was willing to risk such cross-examination and rebuttal if there were some significant "objective" evidence of brain disorder upon which he could rely, he was unwilling to do so with anything less.

For the Los Angeles trial, Charvet had information about an examination of Bonin arranged by Hanson, and a copy of the Atascadero records. The Atascadero records contained no indication that Bonin suffered from organic brain damage, neurological disorder, or any psychiatric disorder other than sexual sadism and antisocial personality disorder. The Atascadero records also indicated that Bonin was quite intelligent, with a tested IQ of 120, and that he was neat, clean, well-behaved, nonviolent, and even helpful in prison. Based on this information and his personal knowledge of Bonin, it was reasonable for Charvet to conclude that no significant "objective" evidence of brain disfunction would be forthcoming, and to proceed to trial with his "institutional adjustment" argument and the other available mitigation evidence without also presenting expert psychiatric testimony.

In preparation for the Orange County trial, Charvet had this information and also retained an expert, Dr. Lunde, to determine whether any psychiatric evidence in mitigation was available. After Dr. Lunde examined Bonin and made a preliminary report that he was not turning up anything major, Charvet called off his investigation and subsequently declined to use his testimony at trial. This decision was consistent with his tactical decision not to use such expert testimony unless there was something significant and "objective" to show the jury.

The Supreme Court has explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and that "choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Charvet's decision to employ principally an "institutional adjustment" mitigation theory obviated the need to procure extensive psychiatric evaluations of Bonin. Given the tactical decision to utilize expert psychiatric testimony only if there was some major "objective" finding upon which to rely, it was reasonable for Charvet to limit his investigation into Bonin's psychiatric condition in preparation for the Los Angeles trial to a review of the Atascadero records and any psychiatric evaluations prepared at Hansen's direction. It was also reasonable for Charvet to discontinue any further investigation into Bonin's psychiatric condition in preparation for the Orange County trial after Dr. Lunde's preliminary report corroborated the Atascadero and other medical records that indicated that Bonin did not suffer from any brain damage, neurological disorder, or other significant "objective" psychiatric condition. Although with hindsight one may question Charvet's tactical decisions, they were certainly reasonable at the time.

Finally, although Padgett was less helpful a witness in Orange County than Shuttleworth had been in Los Angeles, it was not unreasonable for Charvet to call her as a defense witness. Given that Bonin had been sentenced to death in the Los Angeles case despite Shuttleworth's testimony, it was reasonable for Charvet to try something different. That reasonableness is not diminished because Padgett was, in hindsight, not as effective a witness.

Bonin points to a number of cases which he contends require us to reach the opposite result. In *Deutscher v. Whitley,* 884 F.2d 1152 (9th Cir.1989), *vacated and remanded on other grounds,* 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991), for example, we concluded that an attorney's performance was deficient where his "sole mitigation argument was that Deutscher must have had some sort of mental problem" yet counsel failed to investigate, present, or even consider presenting any such mitigating evidence. *Id.* at 1159. However, we specifically said that "[c]ounsel made no tactical decision not to investigate Deutscher's possible mental impairment. He simply failed to do so." *Id.* Moreover, we went on to explain that "[w]e do not hold that failure to present mitigating evidence at a capital sentencing hearing is always defective performance. In certain cases, counsel might reasonably decide that mitigation evidence would present more problems than it would solve." *Id.* Indeed, Charvet ruled out the use of expert psychiatric testimony in both the Orange County and Los Angeles trials largely because of the problems it would have caused. Furthermore, Charvet did not use mental defect as a "sole" mitigation argument, but instead relied on evidence of institutional adjustment.

In *Evans v. Lewis,* 855 F.2d 631 (9th Cir. 1988), we also held an attorney's performance deficient for failure to present mitigating evidence at the sentencing hearing in a capital case. But there, "counsel presented *no* evidence of mitigation" at all, even though the relevant death penalty statute required the sentence of death where at least one aggravating factor and no mitigating factors were presented. *Id.* at 637 (emphasis in original). Counsel's failure to present any mitigating evidence in that case could not be construed as a trial tactic. *Id.*

Our recent decision in *Wade* also does not require a different result. In *Wade,* counsel not only failed to present "*any* significant evidence of abuse at the penalty phase," but went on to call forth Wade's alternate personality named "Othello" who challenged the jury to put him to death, and to argue that execution would be an outcome favorable to Wade. *Wade,* 29 F.3d at 1323–24.

While *Evans, Deutscher,* and *Wade* are clearly inapposite here, *Darden* is closer to the mark. There, the Supreme Court held that trial counsel's failure to present any mitigating evidence at the sentencing hearing in a capital case did not constitute deficient performance under *Strickland. Darden,* 477

U.S. at 184–87, 106 S.Ct. at 2473–75. The attorney instructed Darden to "plea for mercy," and refrained from presenting any psychiatric or other mitigating testimony. *Id.* at 186, 106 S.Ct. at 2474. The Court held this conduct reasonable because the attorney feared that the presentation of such testimony would open the door to more damaging rebuttal testimony. *Id.* *Darden* clearly supports our conclusion that Charvet acted reasonably in refusing to employ expert psychiatric testimony because it would have allowed the prosecution during cross-examination and rebuttal to rehash the horrific details of Bonin's crimes.

It is clear that Bonin has failed in his burden to prove that Charvet's decisions fell outside of the wide range of constitutionally adequate representation. Bonin has not overcome the strong presumption required by *Strickland* that Charvet's conduct was reasonable.

### F.

■ We also conclude that Bonin has failed to establish that he has suffered prejudice as a result of Charvet's allegedly deficient representation. "[I]n cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel." *United States v. Coleman,* 707 F.2d 374, 378 (9th Cir.), *cert. denied,* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983). Similarly, in cases such as this where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence.

■ In this case, the aggravating circumstances were so numerous and so compelling that it is highly improbable that either jury would have returned a sentence of life imprisonment rather than death, even if all of the possible mitigating evidence offered by Bonin at the evidentiary hearing had been presented at his trials.

As we explained earlier, Bonin has demonstrated the existence of very little probative evidence of childhood abuse or neglect other than the very evidence employed by Charvet

in both trials. The additional childhood evidence offered by Bonin would clearly not have had any effect on either jury's decision to impose the death penalty.

With regard to the omission of expert psychiatric testimony, the district judge concluded that Bonin "has failed to provide persuasive evidence of brain organicity or other psychiatric or neurological disorder." *Bonin v. Vasquez,* 807 F.Supp. at 597. He explained that Bonin "did not demonstrate any correlation between Dr. Pincus' findings, which were obtained in late 1991, and petitioner's mental condition at the time of the murders." *Id.* at 598. The court also found "that Drs. Dietz and Nuwer were more credible than Dr. Pincus," and that the court "cannot help but believe that Dr. Pincus' views on the inappropriateness of the death penalty affect his clinical interpretations in this highly subjective area of medicine." *Id.*

The district court's finding that Bonin did not prove that he had suffered from brain damage or other significant psychiatric or neurological disorder at the time he committed his crimes is amply supported by the record and is not clearly erroneous. Bonin's evidence was insufficient to show that unlimited investigation by Charvet into Bonin's psychiatric condition would have produced anything more significant than the unpersuasive testimony presented by Drs. Pincus and Foster. At best, such testimony would only have initiated a battle of experts on which Bonin would have been on the losing side. At worst, it would have distracted jurors from Charvet's "institutional adjustment" theory and the childhood and Vietnam mitigation evidence, reduced Charvet's credibility with the jury, and opened the door to powerful cross-examination and rebuttal.

The aggravating circumstances presented by the prosecution in both trials was overwhelming. Bonin has not proven that the use of expert psychiatrists would likely have changed the outcome, and has therefore failed to meet his burden of proving prejudice.

### G.

Bonin also argues that a number of decisions by the district court deprived him of a

full and fair evidentiary hearing on his ineffective assistance of counsel claims.

## 1.

Bonin contends that the district court erred in refusing to provide additional funds for investigative services pursuant to 18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(4)(B). On July 9, 1991, the district court approved Bonin's $2,000 request for investigative work in Connecticut to locate potential childhood mitigation evidence. On October 30, 1991, and November 7, 1991, as the evidentiary hearing was drawing near, Bonin made two additional requests, each seeking an additional $2,000, for further investigative work in Connecticut. On November 22, 1991, the district court denied both requests. The district court also denied Bonin's last minute requests for funds to have witnesses from Connecticut flown to Los Angeles to testify and instead agreed to accept their declarations in lieu of live testimony.

18 U.S.C. § 3006A requires the district court to provide funds to certain persons, including petitioners seeking relief under 28 U.S.C. § 2254, who are "financially unable to obtain investigative, expert, or other services necessary for adequate representation" upon a proper ex parte request. The amount of such funding, however, is limited to $1,000 unless the district court certifies that additional funds are required and the additional funds are approved by the Chief Judge of the circuit.

■ 21 U.S.C. § 848(q)(4)(B) and (q)(9) requires the district court, upon proper ex parte application, to provide indigent habeas corpus petitioners seeking to vacate or set aside a death sentence with funds for investigative, expert or other services that are "reasonably necessary" for the representation of the petitioner if he is financially unable to obtain them himself. Section 848(q)(4)(B) and (q)(9) indicates that the amount of funds that may be provided under section 848(q)(4)(B) and (q)(9) is not, as the government argues, limited by the provisions of 18 U.S.C. § 3006A(e)(3). Instead, the district court is vested with discretion to authorize the expenditure of an amount of funds "reasonably necessary" for the representation of

the petitioner. 21 U.S.C. § 848(q)(4)(B) and (q)(9).

■ The "decision to grant or deny a request for investigative services under § 3006A(e) is committed to the discretion of the trial court, and will be overturned on appeal only for an abuse of discretion." *United States v. Smith*, 893 F.2d 1573, 1580 (9th Cir.1990) (*Smith*). Similarly, the district court's decision to grant or deny funding under 21 U.S.C. § 848(q)(4)(B), and the amount of funding provided under that section, is also reviewed for abuse of discretion. *See In re Lindsey*, 875 F.2d 1502, 1507 n. 4 (11th Cir.1989).

■ We have held in non-habeas corpus cases that we will reverse a conviction because of a failure to provide funds under section 3006A only if the defendant establishes that he was deprived of effective assistance of counsel as a result. Thus, the defendant must establish: (1) that reasonably competent retained counsel would require such services for a client who could pay for them, and (2) that the lack of investigation prejudiced the defense. *Smith*, 893 F.2d at 1580; *United States v. Fields*, 722 F.2d 549, 551 (9th Cir.1983), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 189 (1984); *United States v. Becerra*, 992 F.2d 960, 965 (9th Cir.1993) (*Becerra*). Prejudice must be shown by clear and convincing evidence. *Becerra*, 992 F.2d at 965. We hold that this standard also governs habeas corpus cases in which funds are requested under section 3006A or section 848(q). We will therefore reverse the district court's denial of Bonin's habeas petitions only if Bonin: (1) establishes that reasonably competent retained counsel would have required the requested services for a habeas petitioner who could pay for them, and (2) demonstrates by clear and convincing evidence that the defense was prejudiced by the lack of further investigation.

■ Bonin had already secured substantial evidence of his imperfect childhood, including the declarations of several persons who had lived in the same orphanage and who stated that the conditions there were unpleasant. Additional declarations would

have been merely redundant and reasonably competent retained counsel would not have required them. Reasonably competent retained counsel would also not have required these individuals to travel to Los Angeles to attend the evidentiary hearing, as the district court agreed to admit their declarations into evidence. Moreover, Bonin has failed to show prejudice flowing from the denial of funds. Therefore, we conclude that the district court did not abuse its discretion in refusing to allow additional investigative funding.

### 2.

Bonin also argues that certain evidentiary rulings deprived him of a full and fair evidentiary hearing before the district court. The "district court's evidentiary rulings are reviewed for an abuse of discretion and will not be reversed unless the party has been prejudiced." *Price,* 961 F.2d at 1474.

Bonin contends that the district court abused its discretion by refusing to hear evidence that Charvet was abusing drugs before and during the trials. Because we use an objective standard to evaluate counsel's competence, once an attorney's conduct is shown to be objectively reasonable, it becomes unnecessary to inquire into the source of the attorney's alleged shortcomings. *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071. Because we conclude, as the district court did, that Charvet's performance did not fall below the standard of objective reasonableness, it is irrelevant whether Charvet used drugs. *See Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985) (drug use by attorney not relevant in and of itself to an ineffective assistance claim; relevant inquiry is whether counsel's performance was deficient and caused prejudice), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986); *McDougall v. Dixon,* 921 F.2d 518, 535 (4th Cir.1990) ("appellant must show that the medication affected his attorney in such a way that he could not and did not render adequate legal assistance during the trial"), *cert. denied,* 501 U.S. 1223, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991); *see also Smith v. Ylst,* 826 F.2d 872, 876 (9th Cir.1987) (attorney's mental illness does not constitute inef-

fective assistance per se; court must evaluate attorney's actual conduct of trial in light of allegations of mental illness), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988). Because evidence of drug use is not relevant in and of itself, the district court did not abuse its discretion in refusing to admit evidence that Charvet used drugs.

Bonin also suggests that the district court abused its discretion by refusing to allow an expert on juror psychology (a "*Strickland* expert") to testify concerning the likelihood that Bonin suffered prejudice as a result of Charvet's alleged errors and omissions. A district court's decision whether to allow expert testimony is reviewed for abuse of discretion. *United States v. Rahm,* 993 F.2d 1405, 1409–10 (9th Cir.1993).

Federal Rule of Evidence 702 permits expert testimony if "[it] will assist the trier of fact." It was reasonable for the district judge to conclude that a juror psychology expert would not be helpful to him. The district judge is himself qualified to assess the likely responses of a jury to certain evidence and is also qualified to understand the legal analysis required by *Strickland.* There was no abuse of discretion.

Bonin further contends that the district court abused its discretion by refusing to allow Bonin to attack Charvet's credibility by introducing State Bar Association records that allegedly indicate that Charvet committed bad acts against his clients. As we explained earlier in part II with respect to Bonin's *Cuyler* claim, the district court did not abuse its discretion. *See supra* at 828–829.

### 3.

Bonin asserts that the district court abused its discretion by refusing to conduct an evidentiary hearing on the issue of whether Charvet was biased against him. Because Bonin failed to allege facts which, if proved, would entitle him to relief, the district court was not required to hold an evidentiary hearing. *Hendricks v. Vasquez,* 974 F.2d 1099, 1103 (9th Cir.1992). The only fact alleged in support of Bonin's charge that Charvet was biased against him is an off-the-record ex-

pression of ill feeling toward Bonin during an in-chambers conference. Bonin does not even allege that he was prejudiced as a result. Such a statement did not constitute a breakdown of the adversarial process or deny Bonin effective assistance of counsel.

Bonin cites *Frazer v. United States*, 18 F.3d 778 (9th Cir.1994) (*Frazer*), but *Frazer* is clearly inapplicable. Frazer testified that his attorney called him a "stupid nigger son of a bitch and said he hopes I get life." *Id.* at 780. Worse yet, the attorney threatened to "be very ineffective" if his client insisted on going to trial. *Id.* While the facts of *Frazer* supported the need for an evidentiary hearing to determine if counsel breached his duty of loyalty and denied his client effective assistance of counsel, the same cannot be said merely because an attorney expresses dislike for a client. If being liked by one's lawyer were a sine qua non of effective representation, some clients might never be effectively represented. Thus, the district court did not abuse its discretion by refusing to hold an evidentiary hearing on this issue.

### IV

Bonin contends that the prosecution's presentation of Bonin's Orange County murders, for which he had not yet been tried, at the penalty phase of the Los Angeles trial violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. At the penalty phase of Bonin's Los Angeles trial, the court admitted, over Bonin's objection, evidence of the four Orange County murders. The admission of this evidence was pursuant to California Penal Code § 190.3(b), which permits the introduction of evidence of past violent criminal activity at the penalty phase of a capital case, even if the defendant has not been tried for the crimes. *People v. Phillips*, 41 Cal.3d 29, 67–72, 222 Cal.Rptr. 127, 711 P.2d 423 (1985).

Bonin argues that when the Orange County murders were offered to the jury as an aggravating factor, he was presented with a Hobson's choice—he could either admit his guilt to the Orange County murders and testify about any mitigating circumstances surrounding them or he could remain silent.

If he admitted his guilt in order to testify about mitigating circumstances, however, his admission could then be used against him at the guilt phase of the Orange County trial. If he remained silent, he would preserve his ability to defend on the issue of guilt in the Orange County trial, but would forfeit his right to present all available mitigating evidence in the Los Angeles trial. Thus, he argues that by admitting evidence of crimes for which he was yet to be tried, the trial court effectively forced him to forgo either his Fifth Amendment right against self-incrimination or his Eighth Amendment right to present all available mitigating evidence in order to avoid the death penalty.

In rejecting this argument, both the district court and the California Supreme Court relied on *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated*, 408 U.S. 941, 942, 92 S.Ct. 2873, 2873, 33 L.Ed.2d 765 (1972). In *McGautha*, the Supreme Court upheld the use of unitary trials in capital cases. *Id.* at 220. In challenging the constitutionality of unitary capital trials, the defendant used the same argument that Bonin now makes concerning the admission of evidence of the Orange County murders. The defendant argued that unitary trials are unconstitutional because they require the defendant either to remain silent and forbear the opportunity to testify about evidence in mitigation or to risk having his testimony on the issue of punishment used against him on the issue of guilt. *Id.* at 210–11, 213. The Supreme Court rejected this argument, explaining that "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow.... Although a defendant may have a right, even of constitutional dimension, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.* at 213 (citation omitted). The Court further stated that, "[t]he threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id.* After reviewing the policies of both the Fifth Amendment privilege against self-incrimination and the right to

present evidence in mitigation, the Court concluded that the policies of neither right were significantly implicated by forcing the defendant to choose between remaining silent on both issues and testifying with respect to both issues. *Id.* at 213–20.

*McGautha* itself is not binding because it was later vacated, 408 U.S. at 941–42, 92 S.Ct. at 2873 (1972), in light of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Eighth Amendment requires that discretion of sentencing jury be limited by appropriate guidelines to prevent arbitrary infliction of death sentence). *Furman,* however, neither addressed the constitutionality of unitary trials nor in any other way undercut the rationale of *McGautha* that a defendant can be forced to choose between testifying in mitigation and remaining silent on the issue of guilt.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court elaborated on *Furman,* stating that while certain Eighth Amendment "concerns are best met by a system that provides for a bifurcated proceeding ... [w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman.*" *Id.* at 195, 96 S.Ct. at 2935. Thus, the Court in *Gregg* made it clear that unitary trials in capital cases are constitutionally permissible so long as procedures are employed to guide adequately the discretion of the sentencing authority. If unitary trials are constitutionally permissible, as *Gregg* suggests, the rationale of the Court in *McGautha* must retain vitality. Further evidence that the *McGautha* reasoning remains sound is that the very passage we have quoted has continued to be cited both by this court and by the Supreme Court. *See Newton v. Rumery,* 480 U.S. 386, 393–94, 107 S.Ct. 1187, 1192, 94 L.Ed.2d 405 (1987); *Corbitt v. New Jersey,* 439 U.S. 212, 218–19 n. 8, 99 S.Ct. 492, 497 n. 8, 58 L.Ed.2d 466 (1978); *United States v. Yarbrough,* 852 F.2d 1522, 1529 (9th Cir.) (*Yarbrough* ), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988).

Finally, in *Yarbrough* we expressly adopted the reasoning of *McGautha* in holding that a defendant in federal court is not deprived of his Fifth Amendment privilege against self-incrimination simply because he faces prosecution in state court on related charges. *Yarbrough,* 852 F.2d at 1529–30. A defendant in such a situation faces precisely the same dilemma that Bonin faced when evidence of the Orange County murders was introduced at the penalty phase of the Los Angeles trial, yet we concluded that the policies of the Fifth Amendment guarantee against self-incrimination were not significantly implicated by putting the defendant to the choice of testifying in one trial, at the risk of his testimony being used against him in the second trial, or remaining silent in both. *Id.* at 1529. We conclude that the reasoning of *Yarbrough* and *McGautha* is controlling, and that Bonin was not deprived either of his Fifth Amendment right against self-incrimination, or his Eighth Amendment or due process rights to present evidence in mitigation.

V

Bonin asserts that the denial of his motion for change of venue from Orange County deprived him of a fair trial. He asserts that pretrial publicity was so extensive that a fair jury could not be secured. Bonin did not provide us with any exhibits that were before the state trial court.

In *Austad v. Risley,* 761 F.2d 1348 (9th Cir.) (en banc), *cert. denied,* 474 U.S. 856, 106 S.Ct. 163, 88 L.Ed.2d 135 (1985), we made it clear that the district court does not have a duty to request and review the state court record sua sponte, absent a showing that the petitioner is unable to produce it. *Id.* at 1351. We further held that "[i]f an applicant who is able fails to produce the record, then he fails to carry his burden of establishing that the state court's factual determination is not supported by the record." *Id.* at 1353.

The state trial court found that Bonin could receive a fair trial in Orange County. This finding was affirmed by the California Supreme Court. *People v. Bonin,* 46 Cal.3d at 677, 250 Cal.Rptr. 687, 758 P.2d 1217. In *Chaney v. Lewis,* 801 F.2d 1191 (9th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1911, 95 L.Ed.2d 516 (1987), we held that "[a] determination of a juror's par-

tiality or bias and the extent to which pretrial publicity was prejudicial are factual determinations to which § 2254(d)'s presumption of correctness applies." *Id.* at 1194. The district court therefore properly treated this determination as a finding of fact entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(d). *See Bonin v. Vasquez,* 794 F.Supp. at 974. Since Bonin failed to produce any of the exhibits presented to the state trial court and failed to raise any new facts, the district court properly concluded, in accord with *Austad,* that Bonin had failed to overcome "the presumption of correctness that attaches to the state court's decision." *Id.*

## VI

Bonin contends that he was denied effective assistance of counsel and due process because the judge in the Orange County case refused to allow his second attorney, Tracy Stewart, to make a closing argument at the penalty phase of the trial. After the close of the penalty phase evidence, the prosecutor presented his argument followed by Charvet's argument. The prosecutor then stated that he would not argue in rebuttal. A discussion then ensued, the relevant portion of which is provided in *People v. Bonin,* 46 Cal.3d at 691–93, 250 Cal.Rptr. 687, 758 P.2d 1217. The trial court was concerned because the defense team had indicated earlier that both Charvet and his associate would argue. In response, the court held that the two counsel would be allowed to argue only if they proceeded alternately, one giving a closing argument and the other providing surrebuttal. Since there would be no rebuttal, there was no opportunity for Stewart to argue in surrebuttal. The prosecutor repeatedly protested that he had "told everybody" that he would make no rebuttal argument, and Charvet responded: "He told us, but I didn't believe him." Because the trial court concluded that Stewart was allowed to argue only in surrebuttal, he did not allow further argument and proceeded to instruct the jury.

California Penal Code § 1095 provides: "If the offense is punishable with death, two counsel on each side may argue the cause."

In addressing this claim in Bonin's direct appeal, the California Supreme Court held that section 1095 does not require the two members of the defense team to proceed alternately, and that the Orange County court therefore erred. *Id.* at 693–95, 250 Cal.Rptr. 687, 758 P.2d 1217. The California Supreme Court went on, however, to explain that section 1095 does not create an absolute right to have two counsel argue apart from the more general guarantees of the Sixth Amendment and the Due Process Clause that counsel have a full and fair opportunity to participate in the adversary process. *Id.* at 694–95, 250 Cal.Rptr. 687, 758 P.2d 1217. The court pointed out that Charvet had presented a "full and unrestricted" argument and had indicated that his closing argument was sufficient and that further argument by Stewart was dispensable. *Id.* at 695, 250 Cal.Rptr. 687, 758 P.2d 1217. The California Supreme Court concluded that Bonin received a complete and constitutionally adequate closing argument, and that "under any standard of prejudice the error must be deemed harmless." *Id.* at 695, 250 Cal.Rptr. 687, 758 P.2d 1217.

Because the California Supreme Court is the final expositor of California law, we must accept its conclusion that the judge at the Orange County trial violated section 1095 by erroneously refusing to allow Stewart to argue. However, the violation of Bonin's state law right does not warrant habeas corpus relief. The Supreme Court has frequently held that habeas corpus relief is not available to remedy state law errors, and that "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

Bonin argues that the California statute which gives the defendant in a capital case the right to have two defense attorneys argue in his behalf creates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. A protected liberty interest may be created by state law, but only in limited circumstances. *See Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460–63, 109 S.Ct. 1904, 1908–10, 104

L.Ed.2d 506 (1989) (*Thompson*); *Dix v. County of Shasta*, 963 F.2d 1296 (9th Cir. 1992) (*Dix*). In order to create a liberty interest protected by due process, the state law must contain: (1) "substantive predicates" governing official decisionmaking, and (2) "explicitly mandatory language" specifying the outcome that must be reached if the substantive predicates have been met. *Thompson*, 490 U.S. at 462–63, 109 S.Ct. at 1910; *Dix*, 963 F.2d at 1299. In order to contain the requisite "substantive predicates," the state law at issue "must provide more than merely procedure; it must protect some substantive end." *Dix*, 963 F.2d at 1299. Indeed, we have drawn a careful distinction between procedural protections created by state law and the substantive liberty interests those procedures are meant to protect. *Moran v. Godinez*, 40 F.3d 1567, 1574 (9th Cir.1994); *Smith v. Sumner*, 994 F.2d 1401, 1406 (9th Cir.1993). The denial of state-created procedural rights is not cognizable on habeas corpus review unless there is a deprivation of a substantive right protected by the Constitution. *See Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983). "The state may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." *Id.* (footnote omitted).

■ Section 1095 clearly does not create a protected liberty interest. To the contrary, it merely creates a state procedural right which is itself designed to facilitate the protection of more fundamental substantive rights such as the rights to effective assistance of counsel and a reliable verdict. It contains neither "substantive predicates" protecting a substantive end nor "explicitly mandatory language" requiring a particular result if the "substantive predicates" are met. Bonin's contention that he was deprived of a state-created liberty interest in having two attorneys make closing arguments must therefore fail.

■ It is clear that a criminal defendant has a constitutional right to effective representation, including a right to make a closing argument. *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593 (1975). But there is certainly no federal constitutional right to have two attorneys make closing arguments even in death penalty cases. *See id.* at 862, 95 S.Ct. at 2555 (trial court has great latitude to regulate argument).

■ Preventing Stewart from making a closing summation clearly did not deprive Bonin of a fair trial or deprive him of effective assistance of counsel. Charvet's closing argument was not limited in any way by the trial court. There is no evidence that he refrained from making any arguments in reliance on his expectation that Stewart would also be allowed to speak. Indeed, the available evidence suggests the contrary. Moreover, from an objective perspective, Charvet's closing remarks were more than constitutionally adequate. Bonin has failed to demonstrate any legitimate ground for granting habeas corpus relief due to the Orange County trial court's refusal to allow Stewart to make an additional closing argument.

## VII

Bonin argues that the Los Angeles trial court erred in not suppressing the testimony of Munro and Miley. The basic thrust of Bonin's contention is that the Los Angeles prosecutor broke his promise not to use certain statements Bonin made in a plea bargain meeting, because they were used to help convince Munro and Miley to testify against him.

■ We do not address this contention because it is procedurally barred. The California Supreme Court concluded that Bonin had failed to raise properly any objection during his trial. *People v. Bonin*, 47 Cal.3d at 845, 254 Cal.Rptr. 298, 765 P.2d 460. As the Supreme Court has explained:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or dem-

onstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). Bonin has not demonstrated cause for failing to object at trial. He has also failed to demonstrate actual prejudice or that a fundamental miscarriage of justice will result if this claim is barred. Thus, we do not address it.

### VIII

Bonin maintains that prosecutorial misconduct deprived him of due process. He first complains about the prosecutor's use of David Lopez's testimony. During the guilt phase of the Orange County trial, the prosecution called Lopez, a television reporter, to testify about certain confessions made by Bonin during an interview. Bonin was being tried for only four murders in Orange County. Before Lopez testified, Charvet asked the trial judge about the scope of the testimony that would be permitted. He was concerned about prejudice resulting if Lopez testified, as he had in Los Angeles, that Bonin admitted killing over 20 people. The prosecutor then made an offer of proof, explaining that he "didn't intend to elicit any conversations between Bonin and Lopez with respect to murders other than Fox, Rugh, Barker, Sharp, Wells and Miranda." The prosecutor explained that Bonin admitted killing all of those individuals by name except for Fox, but that he would show that Fox's name was on a list of victims that Bonin admitted killing. The trial court clearly authorized the prosecutor to question Lopez about the six victims he named. Four of the individuals were the Orange County victims and the other two were victims killed in the presence of Munro and Miley. The court indicated reluctance to allow the prosecutor to discuss the other 17 names on the list, but never expressly ruled whether the prosecution could ask how many names were on the list and whether Bonin admitted killing all of them.

In order to get Bonin's confession to the Fox killing into evidence, the prosecutor asked Lopez how many victims were on the list. Over Charvet's objection, Lopez stated that 21 names were on the list. Lopez then testified that Fox's name was among them. Then the prosecutor asked whether Bonin had admitted killing the people on the list. Again, over Charvet's objection, Lopez testified that Bonin admitted killing all of the victims on the list except Lundgren. Charvet protested, arguing that the statements were prejudicial. A motion for a mistrial was denied as was a motion to strike the testimony. The trial court indicated that it was allowing the testimony because it was the only way to establish that Bonin admitted killing Fox.

To constitute a due process violation, the prosecutorial misconduct must be so severe as to result in the denial of Bonin's right to a fair trial. *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 3108–09, 97 L.Ed.2d 618 (1987). Although Bonin frames this argument in terms of prosecutorial misconduct, the issue is really one of alleged trial error because the trial court allowed the testimony. Even if the court's earlier statements could be interpreted as prohibiting such questioning, the court's decision to overrule Charvet's objections and subsequent refusal to strike indicate that the court made a conscious decision to permit the testimony. We conclude there was no error, but even if there were, we may grant habeas corpus relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1714, *quoting Kotteakos,* 328 U.S. at 766, 66 S.Ct. at 1248–49.

Applying this standard, we conclude that Bonin is not entitled to habeas corpus relief. The evidence of Bonin's guilt was overwhelming. The brief revelation that Bonin admitted killing all the boys on the list rather than only six did not deprive him of a fair trial or have a substantial and injurious effect on the jury's verdict.

Second, Bonin contends that reversal is required because the prosecutor knowingly used perjured testimony. Barnes, a jailhouse informant who had been incarcerated with Bonin in the Los Angeles County jail, testified at both trials that Bonin confessed

to killing some boys. Barnes's testimony departed somewhat from the rest of the evidence against Bonin in that Barnes was the only witness who connected Bonin with motorcycles and said that Bonin would talk about "a glass of snot with ice cubes in it." Barnes was also unable to recall any names that were mentioned by Bonin or other salient details. The prosecutors in both cases placed very little weight on Barnes's testimony. It was referred to only briefly during closing arguments in the Los Angeles trial and was not mentioned in either the guilt or penalty phase arguments of the Orange County case.

Six years later, Barnes signed a declaration stating that he had merely memorized a script presented to him by two police officers and two other persons in return for a promise that they would recommend a lesser sentence in his own case, that he discussed the matter with his attorney who instructed him to accept the arrangement, and that the officers gave him hand signals during the trials to help him answer questions in the manner they desired. Barnes signed the declaration in the name of Thomas Allen Porter. It is unclear which is his real name and which is his alias. Bonin asserts that the declaration is true and that the prosecutors knowingly used perjured testimony.

■ If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony is false, the conviction must be set aside if "there is any reasonable likelihood that the false testimony could have affected the jury verdict." *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989), *citing United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–83, 87 L.Ed.2d 481 (1985). Barnes's declaration is the only evidence offered to support a finding that the prosecutors knowingly introduced perjured testimony. The declaration, however, is patently unbelievable. It asserts that several police officers, prosecutors, a judge, and Barnes's attorney all took part in this conspiracy. It asserts that they offered to fix any lie detector test and that they would give him hand signals at trial. The declaration is at best a curious fiction signed by a criminal

incarcerated at Folsom State Prison with no reason not to lie.

■ But even if the declaration were true, there is no reasonable likelihood that the testimony affected the jury's verdict. Four other witnesses testified that Bonin had admitted killing young males, and Barnes's testimony was hardly used by the prosecution in either trial. Considering that there was overwhelming evidence of Bonin's guilt and that Barnes's testimony constituted but a very small fraction of the total evidence against him, it is not reasonably likely that the alleged perjured testimony affected the jury's verdict.

## IX

Bonin contends that the district court abused its discretion by denying his May 15, 1991, motion to amend the Orange County petition. Bonin filed his Orange County petition on July 11, 1990. On March 13, 1991, over eight months later, the State filed a motion to compel Bonin to identify all possible claims or waive them. *See Neuschafer v. Whitley*, 860 F.2d 1470, 1482 (9th Cir.1988), *cert. denied*, 493 U.S. 906, 110 S.Ct. 264, 107 L.Ed.2d 214 (1989). On April 19, 1991, the district court denied the motion. It explained that there was no longer any risk of piecemeal litigation because the Supreme Court had just decided *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), which held that claims raised in subsequent habeas corpus petitions would be barred absent a showing of cause and prejudice. In its order denying the motion to compel, however, the Court stated that it would "allow [Bonin] until May 13, 1991 ... to file an amended petition for either or both ... cases to include any additional claims upon which the petitioner alleges relief may be granted." The court subsequently extended the deadline to file any additional documents including "an amended petition" to May 15.

On May 15, Bonin filed a "First Amendment" to his petition adding eight "new" claims. The court subsequently refused to allow Bonin to add the additional claims. The district judge explained that although he had granted Bonin leave to amend his peti-

tion, he did so only because of the possibility that any claims discovered after the filing of the first petition might be barred, pursuant to *McCleskey,* in any subsequent habeas petition. The district judge stated that all of the "new" claims presented in the First Amendment could have been raised when Bonin initially filed his petition. He then went on to treat Bonin's proposed amendments as a second habeas petition, concluded that the new claims constituted an abuse of the writ, and dismissed the proposed amendments citing *McCleskey* and Rule 9(b) of the Rules Governing Section 2254 Cases.

Bonin filed a motion to reconsider, and the district court issued an eight-page order denying the motion which carefully explained the district court's reasons. The district judge stated that in issuing his initial order allowing Bonin leave to amend his petition, he had expected that Bonin would amend only with claims discovered since the filing of his petition. He assumed this based on Bonin's opposition to the State's *Neuschafer* motion and Bonin's representations to the court that his petition was "professionally and capably prepared and ... fully comprehensive," and that he was not keeping claims "in his hip pocket." The district court addressed *McCleskey* briefly, but did so just to explain that it had denied the government's *Neuschafer* motion and granted Bonin leave to amend only to ensure that Bonin had an opportunity to raise any new claims that he had discovered since the filing of the petition which might later be precluded under *McCleskey* if not then raised. The district court then explained that four of the proposed amendments (claims V, W, X, and Y) arose out of facts that had already been raised in the Los Angeles petition—Bonin's decision to provide the prosecution with a taped confession for purposes of plea bargaining. The court pointed out that Bonin raised this issue in his automatic appeal in the Los Angeles case and was therefore clearly aware of the issue, yet just two months before attempting to add the amendments represented to the court that the petition was full and complete and that he was not keeping any claims in his hip pocket. The court explained that claims AA, CC, and two of the three parts of BB merely restated

arguments and relied on facts already raised in the petition. Finally, it explained that only claim Z and one part of claim BB were unrelated to claims already raised in the petition. However, it went on to demonstrate that the claims were patently frivolous. In summation, the court reiterated that Bonin's federal habeas corpus counsel also represented him in his automatic appeals and state habeas proceedings (in both the Los Angeles and Orange County cases), and that counsel attempted to raise these eight "old" claims only two months after assuring the court that it had no other claims to raise.

■ Bonin argues that the district judge abused his discretion by refusing to allow the amendments because Rule 15(a) requires that amendments be freely allowed. Rule 15(a) allows a party to amend his complaint by leave of the court at any time, and such leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The denial of a motion for leave to amend pursuant to Rule 15(a) is reviewed "for abuse of discretion and in light of the strong public policy permitting amendment." *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604, 614 (9th Cir.1993) (*Outdoor Systems*). In doing so, we often consider: bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings. *Western Shoshone Nat'l Council v. Molini,* 951 F.2d 200, 204 (9th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 74, 121 L.Ed.2d 39 (1992). However, each is not given equal weight. Futility of amendment can, by itself, justify the denial of a motion for leave to amend. Thus, in *Outdoor Systems,* 997 F.2d at 614, we affirmed the district court's denial of a motion for leave to amend because the proffered amendments would be nothing more than an exercise in futility. Additionally, we have held that a district court does not abuse its discretion in denying a motion to amend where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to fully develop his contentions originally. *Allen v. City of Beverly Hills,* 911 F.2d 367, 374 (9th Cir. 1990).

In the present case, four of the amended claims relate to Bonin's decision to speak to the Los Angeles prosecutors in furtherance of a potential plea bargain. These facts were placed in issue in Bonin's Los Angeles petition as well as in his automatic appeal of the Los Angeles case. These theories should have been pleaded in his petition originally. The remainder of Bonin's proposed amendments are either duplicative of existing claims or patently frivolous, or both. Amending the petition to include them would be futile.

Bonin also argues that we must remand these claims to the district court because the district court did not properly exercise its discretion under Rule 15 because it incorrectly believed that the strict "cause and prejudice" standard of *McCleskey* applied. The district court is deemed to have abused its discretion if it applies incorrect legal standards. *See, e.g., Zepeda v. INS*, 753 F.2d 719 (9th Cir.1983) (motion for preliminary injunction). The district court's initial order raised the *McCleskey* issue, but its subsequent thorough and well-reasoned order denying the motion to reconsider makes it clear that it was exercising its discretion and that its decision was guided by appropriate considerations. The district judge did state once in his denial of the motion to reconsider that Bonin was "abusing the writ." This incidental reference to the doctrine of abuse of the writ, however, does not support the conclusion that the district court believed that it was forced to dismiss the amendments under *McCleskey*. We conclude that the district court did not abuse its discretion in denying Bonin's May 15, 1991, motion to amend the Orange County petition.

Bonin also contends that the district court abused its discretion by denying his December 23, 1991, motion to amend the Los Angeles petition. As explained earlier, the district court granted Bonin until May 15, 1991, to amend either petition. Bonin's December 23, 1991, motion to amend the Los Angeles petition was therefore seven months late. Moreover, the claims raised were identical to the ones raised in Bonin's May 15, 1991, motion to amend the Orange County petition. In denying the motion, the district court explained that the motion was untimely and expressly adopted the reasoning contained in its December 23, 1991, denial of Bonin's motion to reconsider its May 23, 1991, order dismissing Bonin's proposed amendments to the Orange County petition. Because the motion to amend was untimely and because the district court's December 23, 1991, order denying Bonin's motion to reconsider was based on appropriate considerations, we conclude that the district judge did not abuse his discretion.

Bonin also asserts that the district court abused its discretion by denying his August 18, 1992, motion to amend the Los Angeles petition. *Bonin v. Vasquez*, 807 F.Supp. 586 (C.D.Cal.1992). Because final judgment had not yet been entered in the Los Angeles case, this motion was correctly treated as an untimely Rule 15(a) motion to amend the petition. *Bonin v. Vasquez*, 999 F.2d at 427, 431. Although the district court opined that Bonin's August 18, 1992, motion to amend the Los Angeles petition constituted "abuse of the writ," it did not in any way rely on *McCleskey*. *Id.* at 431. The district court did not abuse its discretion in denying this motion. As the district court explained, Bonin brought this motion "long after the work in the case had concluded and seven months after the Court took the petition under submission." *Bonin v. Vasquez*, 807 F.Supp. at 587. Moreover, because Bonin "brought the motion only after the Court denied the petition in his Orange County case," the district court correctly found that Bonin had acted in bad faith by not proposing the amendments earlier. *Id.* The district court also pointed out that Bonin had already been granted an opportunity to amend the petition, and had failed to do so despite the fact that the claims were apparent given the briefest of investigation. *Id.* Although there is a strong policy of liberally allowing amendments pursuant to Rule 15(a), and this policy is of no less significance in section 2254 cases in which *McCleskey* will bar subsequent petitions, we conclude that the district court did not abuse its discretion. Bonin's belated and bad faith efforts to amend the Los Angeles petition did amount to an abuse of the writ.

Finally, Bonin challenges the district court's denial of his August 18, 1992, motion to amend the Orange County petition. In our previous order, we held that because final judgment had already been entered in the Orange County case, the district court properly construed this motion as a request for relief from the judgment pursuant to Rule 60(b) and correctly required Bonin to comply with the requirements of *McCleskey*. *Bonin v. Vasquez,* 999 F.2d at 427–28. In a "Motion and Request to Correct Prior Opinion and for Submission of Issue VIII for Decision Under Correct Standard of Review," Bonin now contends that the judgment was never entered on a separate document as required by Federal Rule of Civil Procedure 58, and that the district court therefore erred by treating the motion as a Rule 60(b) motion for relief from judgment rather than a Rule 15 motion to amend.

To the extent that Bonin's motion requests correction of factual statements contained in our previous opinion, it is procedurally barred due to his failure to seek such corrections by means of a timely petition for rehearing in accordance with Federal Rule of Appellate Procedure 40.

We have held that the period for filing a notice of appeal does not begin until judgment has been entered on a separate document in compliance with Rule 58. *See Allah v. Superior Court,* 871 F.2d 887, 890 (9th Cir.1989). We have also held that the time limit for filing a Rule 60(b) motion also does not begin to run until judgment has been entered on a separate document. *See Carter v. Beverly Hills Sav. & Loan Ass'n,* 884 F.2d 1186, 1188–90 (9th Cir.1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990). However, the Supreme Court has made it clear that the sole purpose for the separate document requirement is to clarify when the time for appeal begins to run, and that Rule 58's technical separate judgment requirement is not jurisdictional and can be waived. *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 384, 388, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357 (1978); *see also Ingram v. Acands, Inc.,* 977 F.2d 1332, 1339 n. 7 (9th Cir.1992); *Blazak v. Ricketts,* 971 F.2d 1408, 1409 & n. 2 (9th Cir.1992); *Teamsters Pen-* *sion Trust Fund v. H.F. Johnson, Inc.,* 830 F.2d 1009, 1012 (9th Cir.1987). There is no reason why the district court's failure to comply with the separate judgment requirement of Rule 58 should have any bearing on whether Bonin's motion should have been considered under Rule 15(a) or Rule 60(b). The district court issued a written Opinion and Order on July 20, 1992, denying the Orange County petition, which was subsequently published, *Bonin v. Vasquez,* 794 F.Supp. 957 (C.D.Cal.1992). Stamped on the front of the order was a notification to the parties stating: "THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d)." At the end of the order are the words "IT IS SO ORDERED," and the order is signed and dated by the district judge. All of the parties treated this document as a final judgment, and Bonin has not demonstrated that he was prejudiced in any way by the district court's failure to enter judgment on a separate document. Although entry of judgment on a separate document pursuant to Rule 58 triggers the running of the time limit for filing a notice of appeal and for filing postjudgment motions, the district court's order marked the appropriate threshold between prejudgment and postjudgment motions. We conclude that the district court correctly construed Bonin's August 18, 1992, motion to amend the Orange County petition as a Rule 60(b) motion subject to the cause and prejudice standard of *McCleskey*.

### X

Bonin argues that the penalty juries in both trials were biased in favor of the death penalty as the result of numerous instructional errors. Bonin points to six possible instructional errors which he argues violated due process and his Eighth Amendment right to a reliable penalty verdict. "When a habeas petitioner asserts a due process violation on the basis of jury instructions, our review is limited to determining whether an allegedly defective jury instruction so infected the entire trial that the resulting conviction violates due process." *Masoner v. Thurman,* 996 F.2d 1003, 1006 (9th Cir.1993) (internal quotations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 643, 126

L.Ed.2d 602 (1993). We have further explained that " '[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.' " *Id., quoting Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977).

■ When a factor employed as an aid to determine whether the death penalty shall be imposed is challenged as being unconstitutionally vague under the Eighth Amendment, our review should be "quite deferential." *Tuilaepa v. California,* — U.S. —, —, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994) (*Tuilaepa*), *citing Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). A "factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.' " *Id.* — U.S. at — – —, 114 S.Ct. at 2635–36, *quoting Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959–60, 49 L.Ed.2d 929 (1976) (White, J., concurring).

### A.

■ In accordance with California Jury Instructions, Criminal (CALJIC) No. 8.8.42, the trial courts in both cases listed the statutory mitigating circumstances and instructed the jury to consider the listed factors that were applicable. *Bonin v. Vasquez,* 807 F.Supp. at 619; *Bonin v. Vasquez,* 794 F.Supp. at 979. Bonin argues that this allowed the juries to consider the absence of numerous possible mitigating circumstances to be aggravating circumstances.

We recently rejected a virtually identical argument. *Williams,* 52 F.3d at 1481. Both courts instructed the juries to consider the listed factors only "if applicable." The cautionary words "if applicable" warned the jury that not all of the factors would be relevant and that the absence of a factor made it inapplicable rather than an aggravating factor.

### B.

■ Bonin also contends that the instructions in both trials permitted the juries to double count aggravating factors. Both the Los Angeles and Orange County courts instructed the juries to consider: "(a) the circumstances of the crime of which [Bonin] was convicted in the present proceeding and the existence of any special circumstance found to be true; (b) the presence or absence of criminal activity by [Bonin] which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." *Bonin v. Vasquez,* 807 F.Supp. at 620; *Bonin v. Vasquez,* 794 F.Supp. at 981. This instruction was taken verbatim from the then CALJIC No. 8.84.1 (subsequently amended), which was itself taken verbatim from California Penal Code § 190.3. While paragraph (a) obviously refers to the crimes for which the defendant has been convicted, paragraph (b) is intended to refer to crimes for which the defendant has not been convicted. *People v. Bonin,* 47 Cal.3d at 854, 254 Cal.Rptr. 298, 765 P.2d 460. Bonin's argument has been foreclosed by the Supreme Court's recent holding that the version of paragraph (b) at issue here is not unconstitutionally vague. *Tuilaepa,* — U.S. at —, 114 S.Ct. at 2637.

### C.

■ Bonin maintains that the use of age as a factor in sentencing, without specific instructions about how age was relevant or whether it was an aggravating or mitigating circumstance was unconstitutionally vague. This argument fails because the Supreme Court has held that the use of age as a sentencing factor without specific instructions regarding whether it is an aggravating or mitigating factor is not unconstitutionally vague. *Id.* — U.S. at — – —, 114 S.Ct. at 2637–38.

### D.

Bonin contends that the submission of a multiple murder special circumstance for each murder improperly affected the jurors' weighing of the aggravating and mitigating factors. Under California law, "no matter

how many murder charges are tried together, they constitute a single multiple-murder special circumstance." *People v. Anderson,* 43 Cal.3d 1104, 1150, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987). The California Supreme Court concluded that the trial courts in both cases erred in charging Bonin with a multiple-murder special circumstance for each count of murder, but decided the error was harmless. *People v. Bonin,* 47 Cal.3d at 854, 254 Cal.Rptr. 298, 765 P.2d 460; *People v. Bonin,* 46 Cal.3d at 702–03, 250 Cal.Rptr. 687. The district court also concluded that the error was harmless. *Bonin v. Vasquez,* 807 F.Supp. at 615; *Bonin v. Vasquez,* 794 F.Supp. at 981.

▋▋▋ The error committed in charging Bonin with a special circumstance for each count of murder is an error of state law, which was cured for our purposes by the State Supreme Court's conclusion that the error was harmless in Bonin's case. *See Williams,* 52 F.3d at 1480.

### E.

▋▋▋ Bonin further contends that the juries' sense of responsibility for their sentencing decision was unconstitutionally lessened by the trial court's instruction: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose a sentence of death." (Emphasis added.). This argument is foreclosed by the Supreme Court's decisions in *Boyde v. California,* 494 U.S. 370, 374–77, 110 S.Ct. 1190, 1195–96, 108 L.Ed.2d 316 (1990) (holding that the "shall impose" language of California's death penalty sentencing instructions does not violate the Eighth Amendment), and *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990) (holding that the mandatory imposition of the death penalty when one aggravating factor and no mitigating factors are shown does not violate the Eighth Amendment, and explaining that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.").

### F.

▋▋▋ Bonin also argues that the failure to instruct the Orange County jury on the meaning of the term "life without possibility of parole" renders Bonin's Orange County death sentence unreliable. He asserts that the jurors in his Orange County trial may have labored under the misconception that one sentenced to "life without possibility of parole" may actually be paroled, and that the trial courts should therefore have instructed the jury sua sponte that "life without possibility of parole" really means without possibility of parole.

The California Supreme Court did determine that 10 of the 204 prospective jurors examined on voir dire may have held this misconception, but that none of these individuals were selected as jurors or alternates. *People v. Bonin,* 46 Cal.3d at 698, 250 Cal. Rptr. 687, 758 P.2d 1217. Bonin responds that this misconception was widespread and that it is impossible to know exactly how many jurors held it because not all of the prospective jurors were asked about their understanding of the term. Bonin's argument is pure speculation. He offers no evidence that any of the jurors in his trials believed that "life without possibility of parole" means anything other than what it says.

### XI

▋▋▋ Finally, Bonin argues that all of the alleged trial errors and conflicts between himself and his attorney combined to create a wholesale deprivation of counsel which defies particularized analysis and necessitates a new sentencing hearing regardless of whether prejudice is shown. Bonin correctly points out that the total denial of counsel, whether it be actual or constructive, is presumed to result in prejudice. *United States v. Cronic,* 466 U.S. 648, 658–66, 104 S.Ct. 2039, 2046–51, 80 L.Ed.2d 657 (1984) (discussing cases in which errors resulted in constructive denial of counsel altogether and prejudice was not required). Bonin is also correct that some Sixth Amendment violations are so severe that they fundamentally undermine the adversary process and require reversal without any showing of prejudice.

*See, e.g., Frazer,* 18 F.3d at 782–85 (defendant entitled to new trial despite failure to show prejudice where counsel used racial epithets toward defendant and threatened not to assist defendant). Bonin's case, however, clearly does not fit within either of these extremely limited exceptions to *Strickland.*

All other issues raised by Bonin were considered but rejected.

AFFIRMED.

KOZINSKI, Circuit Judge, concurring.

The facts of this case shock even those of us inured to shocking facts by years of capital cases. Most distressing, however, is that these tragedies could have been averted: Bonin gave us more than fair warning of his proclivities before he embarked on his killing spree. The sordid tale begins at least as early as Bonin's service in Vietnam, when "he began to engage in violent nonconsensual homosexual activity." *People v. Bonin,* 46 Cal.3d 659, 671, 250 Cal.Rptr. 687, 758 P.2d 1217 (1988). Upon returning to civilian life, Bonin was twice convicted of kidnapping and sexually molesting a total of five boys between the ages of twelve and eighteen. The first conviction, in 1969, brought him all of three years behind bars; the second, in 1975, only three more. *People v. Bonin,* 47 Cal.3d 808, 824, 254 Cal.Rptr. 298, 765 P.2d 460 (1989). In 1978, Bonin was let loose on an unsuspecting population, condemning at least fourteen (and perhaps as many as twenty-one) more boys to sexual abuse, followed by slow, painful deaths. One knows not whether to pity more the victims of this ordeal or their parents, who must live with the dreadful knowledge of how their children perished.

Scott Geddes also gave us early warning. Geddes started at age sixteen and, prior to his last offense, had already been convicted on felony charges four different times—three for brutal sexual assaults against women. Geraldine Baum, *Crime & Punishment,* L.A. Times, Apr. 12, 1995, at E1 & E4. He received sentences ranging from two to five years for his first four convictions. *Id.* After each release, he usually committed another crime within the month. *Id.* Despite the obvious hazard presented by someone with Geddes's record, the state of New York released him again in 1993. *Id.* at E4. Less than three weeks later, Geddes assaulted his fourth rape victim, stabbed her repeatedly and forced her to walk from her blood-soaked car to a creek. *Id.* There, he finished her off and left her body floating face down in the water. *Id.*

Walter McFadden was convicted of a double rape for which he spent less than five years behind bars. Deroy Murdock, *Lifer Law for Repeat Felons?,* Wash. Times, Apr. 17, 1993, at C1. Released on parole, he hastened to rape again. *Id.* McFadden's second prison stay also lasted less than five years, after which he was again placed on parole. *Id.* Within a year, he murdered two teenagers, and raped and then murdered an eighteen-year old girl. *Id.*

Kenneth McDuff was convicted in 1966 of brutally murdering two teenage boys, *see Green v. Estelle,* 601 F.2d 877 (5th Cir.1979), and raping a teenage girl and snapping her neck with a broomstick. Stephanie Mencimer, *Righting Sentences,* Wash. Monthly, Apr. 1993, at 26. Although McDuff was to receive the death penalty, his sentence was commuted to life in prison and he was paroled in 1989. *Id.* Over the course of the next year, he became a suspect in nine brutal rape-homicides, *id.,* and was eventually convicted of murdering two women, one of them pregnant. Kathy Walt, *Former Parole Chief Sentenced in Perjury,* Houston Chron., Aug. 11, 1994, at 25A, 32A (recounting trial of parole official instrumental in McDuff's release).

Then there is the notorious case of Westley Allan Dodd. Starting in high school, Dodd was arrested numerous times for sexual offenses involving children, including the molestation of his two young cousins and a kidnapping attempt where he admitted he had intended to rape and murder the seven-year-old victim. Timothy Egan, *Death Row,* Vancouver Sun, Jan. 2, 1993, at A1, available in WESTLAW, VNCVRSUN database, *available in* LEXIS, News Library, Allnws file. Even as an adult, Dodd received only brief jail stays, the longest amounting to four months. *Id.* Two years after his last re-

lease, Dodd tortured, raped and murdered a four-year-old boy and two brothers, aged ten and eleven. *State v. Dodd*, 120 Wash.2d 1, 838 P.2d 86, 87–89 (1992). Arrested for trying to kidnap a six-year-old boy, Dodd explained that, given the leniency he had been shown thus far, he figured he could keep getting away with his crimes. Egan, Vancouver Sun, Jan. 2, 1993, at A1. In all, Dodd molested over thirty children. Peter J. Ferrara et al., *The Candidate's Briefing Book* 139 (1994).[1]

There is a pattern here. Of the 2,716 death row inmates in 1993, almost two-thirds had prior felony convictions. Bureau of Justice Statistics, U.S. Dep't of Justice, Bulletin No. NCJ–150042, *Capital Punishment 1993* at 10 (1994). Twenty-eight percent of all death row inmates were on probation, parole or pre-trial release at the time of their capital offense. *Id.* It should come as no surprise, then, that repeat offenders—though only 6% of criminals—commit 70% of all serious crimes. Gwenn Ifill, *Crime Proposal's Effect on Gun Use Is Questioned*, N.Y. Times, May 24, 1991, at A14.

Our society surely has its priorities misplaced when someone with Bonin's record of contempt for the personal integrity of others is released in the blink of an eye, while dealers of controlled substances—even in relatively small quantities—are given ten-year, twenty-year and life terms.[2] Many others have called attention to this disparity. In *United States v. Staufer*, 38 F.3d 1103 (9th Cir.1994), for example, the defendant was convicted on a one-count indictment for selling half a gram of LSD—his first conviction. *Id.* at 1105. The district judge noted with exasperation that he was compelled " 'to give Mr. Staufer for the transaction more time in prison than [he was] authorized to give a man who murdered his wife on their honeymoon.' " *Id.* Were we as committed to punishing and preventing physical violence as we are to waging the war on drugs, Bonin's victims, and those of many other brutal killers, might still be among us.

1. There is a long, dreary list of similar cases. *See, e.g.*, Oliver Starr, Jr., *The Case of Richard Davis*, Nat'l Rev., May 30, 1994, at 34 (describing Richard Allen Davis, who was arrested well over a dozen times before being charged with kidnapping and murdering Polly Klaas); *People v. Viale*, 121 A.D.2d 486, 503 N.Y.S.2d 583, 584 (1986), Charles V. Zehren, *NY Debates Locking Up Repeat Felons for Life*, Newsday, Jan. 16, 1994, at 19 (describing Michael Viale, who had three prior violent felony convictions, including one for murder, before being charged with stabbing a housewife to death); *People v. Gallego*, 52 Cal.3d 115, 276 Cal.Rptr. 679, 708, 802 P.2d 169, 175–76 (1990), *Gallego v. State*, 101 Nev. 782, 711 P.2d 856, 858 (1985), Patricia Holt, *Lurid New Account of 'Sex Slave' Killer*, S.F. Chron., July 17, 1990, at E5 (describing Gerald Gallego, who was charged twenty-seven times and convicted seven times on felony counts before kidnapping, torturing and killing ten young women in his search for the perfect sex slave); *McKenzie v. Osborne*, 195 Mont. 26, 640 P.2d 368, 381 (1981), *State v. McKenzie*, 171 Mont. 278, 557 P.2d 1023, 1033 (1976) (describing Duncan McKenzie, who had been convicted of brutally raping a woman, been paroled, gotten thrown back into prison for numerous parole violations and then been paroled again before brutally raping and killing another woman); *State v. Fischer*, 38 N.J. 40, 183 A.2d 11, 12 (1962), Reuters, July 31, 1979, *available in* LEXIS, News Library, Allnws file (describing Joseph Fischer, who had been convicted of murder, was released and then killed twenty more people).

2. There is a long and not particularly inspiring list for this category as well. *See, e.g.*, *United States v. Van Winrow*, 951 F.2d 1069, 1072 (9th Cir.1991) (affirming life sentence without possibility of parole for twenty-two-year-old because he had previously been convicted of cocaine possession); *United States v. Hoyt*, 879 F.2d 505, 512–14 (9th Cir.1989) (holding that ten-year sentence for first-time offender under cocaine possession statute is constitutional); *United States v. Hanlin*, 48 F.3d 121 (3rd Cir.1995) (affirming ten-year sentence for possession of 167 milligrams of LSD carried on 24.3 grams of paper); *Cracking Down on the Right Targets*, L.A. Times, Sept. 28, 1994, at B6 (percentage of federal prisoners who are drug offenders has quadrupled from 16% to 62% since 1970).